FEDERAL LABORATORIES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 6968.   Promulgated May 29, 1947.

*George Walter Smith, Esq.*, for the petitioner.
*R. Bruce Jones, Esq.*, for the respondent.

OPINION.

HARRON, *Judge*: The Commissioner contends that the net amount of $48,415.23 which petitioner received in 1940 represented royalties and that, therefore, it constitutes ordinary income.

Petitioner seeks a benefit which was allowable for the year 1940 under section 711 (a) (1) (B) of the Internal Revenue Code as it applied to the year 1940.[1] Petitioner's argument is exceedingly brief, considering the nature of the agreements upon which it chiefly relies. Without citing any authorities in the law of patent assignments and licenses and without presenting any argument relating to the legal interests of petitioner in the Coffman patents or inventions, petitioner has been content to rely principally upon *Edward C. Myers*, 6 T. C. 258, and *Parke, Davis & Co.*, 31 B. T. A. 427. The argument of petitioner is simply "that such an agreement is a sale and not a license." The agreement to which petitioner refers is the June 19, 1940, agreement.

Petitioner introduced in evidence three agreements signed by R. A. Coffman; the agreements of December 8, 1932, and January 30, 1940, with petitioner; and the agreement of May 21, 1940, transferring from Coffman an exclusive prepaid license to the English companies in British patents owned by Coffman. Petitioner introduced, also, the June 19, 1940, agreement of the two American and the two English corporations. Another agreement of the New Jersey Breeze Corporations with the British Breeze Corporation, dated September 23, 1936, was introduced. The materiality of the latter agreement has not been made apparent. The only officer of petitioner who testified was the secretary-treasurer. His testimony gives little light or explanation. An attorney who represented the English companies testified. His testimony is limited. The question presented must be decided from the agreements received in evidence.

---

[1] SEC. 711. EXCESS PROFITS NET INCOME.

(a) TAXABLE YEARS BEGINNING AFTER DECEMBER 31, 1939.—The excess profits net income for any taxable year beginning after December 31, 1939, shall be the normal-tax net income, as defined in section 13 (a) (2), for such year except that the following adjustments shall be made:

(1) EXCESS PROFITS CREDIT COMPUTED UNDER INCOME CREDIT.—If the excess profits credit is computed under section 713, the adjustment shall be as follows:

\* \* \* \* \* \* \*

(B) Long-term Gains and Losses.—There shall be excluded long-term capital gains and losses. There shall be excluded the excess of the recognized gains from the sale, exchange, or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property held for more than eighteen months which is of a character which is subject to the allowance for depreciation provided in section 23 (l) over the recognized losses from the sale, exchange, or involuntary conversion of such property. For the purposes of this subparagraph, section 117 (h) (1) and (2) shall apply in determining the period for which the taxpayer has held property which is of a character which is subject to the allowance for depreciation provided in section 23 (l).

[NOTE: Section 711 was added to the Internal Revenue Code by section 201 of the Second Revenue Act of 1940; subsection (B) was amended by section 208 of the Revenue Act of 1942 and the amendment was made applicable to years beginning after December 31, 1939, but not after December 31, 1941. Section 207 (a) of the 1942 Act amended section 711 (a) (1) (B), and that amendment was made applicable to years beginning after December 31, 1941.]

The record indicates that the June 19, 1940, agreement was entered into for reasons having some relation to the intercompany structure in which two American and two British companies were units. All of the stock of Breeze Corporation of Great Britain, Ltd., was owned by Breeze Corporations, Inc., of New Jersey and the Plessey Co., Ltd. Petitioner was a subsidiary of the New Jersey corporation. The record indicates also that the British Air Ministry was interested in the arrangements covered by the June 1940 agreement, that $400,000 was loaned to Plessey by the British Government, and that Plessey purchased the British Breeze stock from New Jersey Breeze under a separate contract.

There is no testimony from any officer of petitioner and there is no document in evidence which directly explains the reason for the payment of $50,000 to petitioner out of the total sum of $384,000 which was paid by the English companies under the June 19, 1940, agreement. There is no evidence on the point of why $100,000 was set apart out of the $384,000 for Federal, except that $50,000 thereof was to be paid by Federal, petitioner, to Coffman. Counsel for petitioner merely stated at the trial that there was an agreement between Federal and its parent company that $100,000 was to be allocated to Federal. There is no evidence that all or part of the $50,000 retained by Federal was not royalties due and unpaid under the license agreement of July 3, 1937, with Plessey, or that it was not in part a lump sum payment of future royalties under a new sublicense from petitioner. The officer of petitioner who appeared was not interrogated on this point, and the attorney who testified could not express any knowledge about the matter.

The question presented may not be disposed of solely under petitioner's failure of proof, however, because petitioner has offered documents upon the basis of which it seeks to bring the issue under the holding in *Edward C. Myers, supra.* The above mention of the state of the record is made for the purpose of pointing out that the record does not support any presumption or inferences about the $50,000 retained by petitioner.

If it is the theory of the petitioner that the agreement between Coffman and petitioner of December 8, 1932, was an assignment to petitioner of all of his rights under his American and foreign patents, rather than a license, we must reject that theory. After careful review of general authorities and of the authorities cited in the *Myers* and *Parke, Davis & Co.* cases, it is concluded that Coffman gave petitioner only an exclusive license, with the right to make sublicenses under foreign patents, reserving to himself the legal title in all of his patents. See *Hatfield* v. *Smith*, 44 Fed. 355; Ridsdale Ellis, Patent Assignments and Licenses, 2d Ed., p. 73, par. 65. An instrument can not be construed as an assignment of patents where it expressly nega-

tives the transfer of legal title. An assignment of an interest in an invention is a contract and, like all contracts, is to be construed so as to carry out the intention of the parties. *Nicholson Pavement Co.* v. *Jenkins*, 14 Wall. 422. In the December 8, 1932, agreement Coffman expressly provided that the agreement was "merely a license agreement" and that it should not be construed as an assignment of any of the patents. As was said in *Hatfield* v. *Smith, supra*, it is true that an exclusive right to make, use, and sell may be an assignment and not a mere license, but the express provision in the contract retaining ownership of the patent in the "licensor" is not to be overlooked, nor is its significance to be disregarded. A licensee has no property in the patent. *Moto Meter Co.* v. *National Gauged Equipment Co.*, 31 Fed. (2d) 994.

Petitioner could make a sale of property under the June 19, 1940, agreement only if it had obtained title to the Coffman foreign patents. It is our understanding of the legal effects of the December 8, 1932, agreement of Coffman that he did not assign his patents to petitioner. Furthermore, in clause "ninth" of that agreement, Coffman gave petitioner a right to grant sublicenses of his foreign patents for the manufacture, use, *or* sale in foreign areas. The license to do less than all three of the above is merely a license, *Waterman* v. *Mackenzie*, 138 U. S. 252 (in this instance a sublicense). A sublicense can be granted only where the license expressly authorizes, and the main licensee is the agent of the licensor in negotiating a sublicense. Ridsdale Ellis, Patent Assignments and Licenses, *supra*, p. 770. It is our view that petitioner under the June 19, 1940, agreement could convey to the English companies or company no greater interest than it received under the Coffman agreement of December 1932 and that under that agreement petitioner could make only a sublicense. Nothing in the June 1940 agreement is in conflict with this view, as far as the terms of the agreement itself show. In fact, the 1940 agreement expressly provided that where the American companies had interest only by way of licenses they would transfer such interests by way of a sublicense.

It is clear that Coffman received $50,000 in 1940 by virtue of his license agreement of December 8, 1932. Petitioner's officer who testified so stated. The supplemental agreement of January 30, 1940, between Coffman and petitioner makes this clear. It stated that the $50,000 would be accepted by Coffman in lieu of accrued and *continued* royalties under his English patents. Also, the agreement which Coffman executed on May 21, 1940, was a prepaid license agreement which indicated that the license would not carry with it any future royalties and Coffman stated, in effect, that he had been paid a sum in advance which might have been due him as royalties under the license.

The implication of the provisions of the agreement of January 30, 1940, and of Coffman's agreement of May 21, 1940, is clearly that as far as his foreign patents, and particularly those in Great Britain, were concerned, the English companies received merely licenses either direct from Coffman under the May 21, 1940, document or through petitioner under clause "ninth" of the December 1932 agreement.

Upon full and careful consideration of all documents and agreements which were made part of the record, and of competent authorities on general principles of law, our conclusion is that petitioner did not *sell* any property interests in 1940 to any British company. Under the arrangements represented by the agreements involved in this case, the situation here was entirely different from that in *Edward C. Myers*, *supra*, and *Parke, Davis & Co.*, *supra*, and it is our view that those cases do not control the question here, but are distinguishable.

After concluding that petitioner sold no property in 1940, it is unnecessary to go further, because section 711 (a) (1) (B) applies only where there is a sale or exchange of property. For example, we are not obliged to decide just what the $50,000 which petitioner retained represented. The evidence does not, for example, establish that the $50,000 had any relation to interests in the Coffman patents and inventions. If it did, there is a strong suggestion from all of the documents. in evidence that it represented one-half of accrued and future royalties under sublicenses which petitioner was permitted to retain under clause "ninth" of the December 1932 agreement with Coffman. Where a taxpayer is entitled to receive royalties and he accepts a lump sum payment in lieu of royalties, he has simply accepted a definite and determined amount instead of an indefinite amount which might thereafter be earned, and such lump sum payment is income. See *J. M. and M. S. Browning Co.*, 6 B. T. A. 914, 930.

One further point deserves comment. Petitioner has not proved anything about a right to receive depreciation allowance on any property. Section 711 (a) (1) (B) requires that the property sold be of a character which is subject to allowance for depreciation. Counsel for petitioner, at the trial, referred to some expenses totaling $2,140.67 which it appears petitioner regards as expense which should be capitalized and recovered by depreciation allowances over some period of time. But no evidence was offered to show what these alleged expenses were. Respondent has allowed petitioner the above amount as some sort of expense in 1940, reducing the amount of the taxable income to $48,405.23. The matter rests there.

It is held that petitioner is not entitled to exclude $48,405.23 from its normal tax net income for 1940 in computing its excess profits tax net income. Respondent's determination is sustained.

*Decision will be entered for the respondent.*