Harold F. Silver and Madelyn Silver v. Commissioner.
Silver v. Commissioner
Docket No. 50046.
United States Tax Court
T.C. Memo 1956-95; 1956 Tax Ct. Memo LEXIS 200; 15 T.C.M. (CCH) 489; T.C.M. (RIA) 56095; April 26, 1956
*200 1. Held: Silver's transaction of January 22, 1947, with Joy Manufacturing Company, wherein the former transferred all of his right, title and interest in and to a continuous coal miner invention conceived by him and reduced to practice in excess of six months prior to the date of such transaction, constituted the outright sale of a capital asset which had been held by Silver for longer than six months, the profit on which sale is taxable as long-term capital gain. 2. Held: Petitioners failed to file a timely declaration of estimated tax for the year 1950 and respondent's imposition of an addition to tax for reason of such omission is sustained. Charles J. Beise, Esq., First National Bank Building, Denver, Colo., and James A. Woods, Esq., for the *201 petitioners. William H. Welch, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income taxes of petitioners and additions thereto, for years and in amounts, as follows: Addition to Tax § 294 § 294
Year
Deficiency
(d)(1)(A) [1]
(d)(2) [1]
1949
$23,784.00
1950
36,284.58
$5,567.68
$2,122.60
1951
22,631.94
Respondent, on brief, concedes error with respect to the petitioners' liability for the additions to tax determined by him under Section 294(d)(2), supra. Thus the questions remaining to be resolved by us are: (1) Whether certain amounts received by petitioner, Harold F. Silver, in each of the years 1949 through 1951 from Joy Manufacturing Company represented long-term capital gains from the sale of a capital asset, ordinary income from the sale of an invention held primarily for sale to customers in the ordinary course of business, or royalty income resulting from a licensing agreement; and (2) whether petitioners filed a timely declaration of estimated tax for the year 1950. Findings *202 of Fact The stipulation of facts filed by the parties, with exhibits attached, is adopted and by this reference made a part hereof. The petitioners are Harold F. Silver (hereinafter referred to as Silver) and his wife, Madelyn, who, during the years involved, were resident in Denver, Colorado. They filed joint income tax returns for such years with the then collector of internal revenue for the district of Colorado. Silver was born on March 15, 1901. In 1917, after he finished high school, Silver was employed for three years as a draftsman for the Ogden Iron Works in Ogden, Utah. He then went to New York City where he attended Columbia University. In 1922, he returned to Utah and was again employed by the Ogden Iron Works. The business of that company was the manufacture of general industrial equipment, including machinery used in the beet sugar industry and in coal mining. Silver served successively as draftsman, mechanical engineer, and, finally, as chief engineer and superintendent in charge of production. From 1923 to 1926, while so employed, Silver attended the University of Utah, where he continued his liberal arts studies. During the entire period from 1917 to 1931 (when *203 he severed his employment with Ogden Iron Works), Silver's employment with the Ogden Iron Works was concerned only with engineering, production, and personnel. After leaving the OgdenIron Works in 1931, Silver designed a machine for the handling of sugar beets known as a beet piler, which he hoped to manufacture and sell. He was unable, at that time, to secure any orders for the machine, and he accepted employment as sales manager with and invested his money in a gas appliance sales concern. After resigning from this company, and in the latter part of 1932, Silver renewed his efforts to interest sugar beet companies in purchasing and using the beet piler which he proposed to manufacture and sell. He was successful in selling one such machine to Holly Sugar Corporation. He had the machine manufactured, and it was installed in 1933 and used successfully at Worland, Wyoming, by such corporation. In 1933, Fred H. Roberts of Denver, Colorado, suggested to Silver that they organize a corporation to engage in the general manufacture of industrial machinery and to manufacture and sell the Silver beet piler. On January 24, 1934, the Silver-Roberts Iron Works, Inc., was organized, having *204 its place of business in Denver, Colorado. Roberts invested $2,510 and received 50.2 percent of the stock. Silver invested $2,490 and received 49.8 percent of the stock. Roberts was president and Silver was general manager. As general manager, Silver assumed full responsibility for all phases of the day-to-day business activities of the corporation, including sales, engineering, production, personnel, and the collection of accounts. These activities occupied Silver's full time and attention. Silver assumed the responsibility for making all sales, and the corporation was successful in selling the beet piler machine invented by Silver, as well as general industrial machines not related to Silver's invention. From 1934 to 1940, approximately one-half of the company's total sales consisted of beet pilers incorporating the Silver invention. In 1937, the corporation entered the steel warehouse business, and this, too, was directly supervised by Silver. On March 16, 1940, Silver purchased from Roberts and his son all of their stock in the corporation, and Silver thereupon became president, as well as general manager. Silver had transferred one-half (1,245 shares) of his original holdings *205 to his wife, Madelyn Silver, on March 1, 1937. On October 1, 1940, he transferred an additional 1,245 shares to her, making her the owner of 49.8 percent of the outstanding capital stock. Silver retained 50.2 percent of the stock and control of the corporation himself from 1940 forward. On March 25, 1940, Silver advised the corporation that all inventions and patents which he developed - past, present, or future - would remain as his separate property, but that he would permit the corporation to manufacture and sell such machines incorporating his inventions and patents as would fit into the general business of the corporation, upon a royalty basis to be determined, and that for the present a 5 percent royalty on the beet piler was satisfactory. In 1940, the name of this corporation was changed to Silver Engineering Works, Inc. Later, in 1950, the name was changed to Silver Corporation. For convenience, the corporation will be hereafter referred to as "Silver Corporation." From 1940 to date, Silver has owned a majority of the outstanding voting stock of the Silver Corporation. No persons have been directors except Silver, his wife, their attorney, and two employees of Silver Corporation. *206 From late 1940 through 1945, substantially all of Silver Corporation's production and the activity thereof and of Silver were devoted to war work, the great bulk of which was obtained through Silver's individual efforts. Silver was an industry member of the Regional War Labor Board, an industry advisor of the War Manpower Commission, and a member of the Regional Board of Governors of the Smaller War Plants Corporation. In 1946, following the completion of extensive Government contracts, Silver Corporation spent substantial sums of money for new machine tools for the production of general industrial machinery and for the contemplated production of two types of machines incorporating Silver's inventions hereinafter described, being designated respectively as the "continuous diffuser" and the "continuous coal miner." The company's production was interrupted not only by the installation of the new machinery but also by a two-months' strike in the machine shop. Silver devoted a large part of his time in the early part of the year to the settlement of this strike and the installation of the new machinery. During the latter part of 1946, the Silver Corporation was involved in serious *207 financial difficulties, which resulted from the major expenditures for new machine tools, the loss of production due to the installation of the new machine tools and the strike, and from a large direct loss in the first marketing of the continuous diffuser. The company had taken orders for a number of the continuous diffusers and had manufactured and installed one such diffuser, the operation of which during the fall of 1946 disclosed serious defects in workmanship and material which required replacement of substantial portions of the machine and raised a serious question in the mind of Silver as to whether the defects could be corrected so as to justify filling the orders then on hand for which deposits of $452,250 had been accepted, some of which were in the course of production. All production had to be stopped on these machines until the defects were overcome. The balance sheet of the Silver Corporation reflecting its critical financial condition as at December 31, 1946, follows: Assets
Current Assets: Cash
$283,947.69
Accounts Receivable
69,933.93
Merchandise Inventory
349,130.73
Work in Process
221,554.31
Federal Tax Refund Receivable
58,388.59
$ 982,955.25
Prepaid Expenses and Other Assets: Prepaid Insurance
$ 2,170.72
Prepaid Group Insurance
2,108.66
State Compensation Insurance Deposit
900.00
Deferred Items
1,941.17
Life Insurance - Cash Surrender Value
3,100.00
10,220.55
Fixed Assets: Machinery and Equipment
$264,384.60
Less Reserve for Depreciation
66,348.73
$198,035.87
Leasehold Improvements
$ 65,463.05
Less Reserve for Depreciation
18,621.66
46,841.39
Furniture and Fixtures - Less Depreciation
7,305.08
Automobiles and Trucks - Less Depreciation
2,651.87
254,834.21
Total Assets
$1,248,010.01
Liabilities
Current Liabilities: Accounts Payable
$ 64,208.56
Employees' Deposits, Inc. - Tax and War Bonds
5,340.79
Customers' Advance Payments on Contracts
452,250.00
Notes Payable - Bank
350,000.00
$ 871,799.35
Accrued Expenses: Property Taxes
$ 13,085.52
Payroll Taxes
5,352.53
Interest and Rent
2,287.50
State Income Tax
2,513.11
State Compensation Insurance and Sales Tax
476.22
23,714.88
Other Liabilities: Notes Payable to President (Over One Year)
75,000.00
Total Liabilities
$ 970,514.23
Net Worth
Capital Stock
$200,000.00
Surplus
77,495.78
277,495.78
Total Liabilities and Net Worth
$1,248,010.01
*208 The "Notes Payable - Bank" are 90-day notes and represented the company's then maximum bank credit. "Customers' Advance Payments on Contracts" represent deposits made on orders for continuous diffusers. The inventory and work in process were largely for the manufacture of continuous diffusers. Operations for 1946 resulted in a net loss of $115,324, being the only loss sustained from the organization of the company to 1946. From 1940 to date, Silver has performed the duties of chief executive and general manager of Silver Corporation, and his full working day has been devoted to these activities, which included the personal handling of all labor negotiations. In addition to the demands on his time as the chief executive of Silver Corporation, he has also devoted many hours to the community activities hereinafter described. From 1934 to date, he has produced substantially all sales of products manufactured by Silver Corporation, and there have been no salesmen employed to sell its products. Under Silver's direction, Silver Corporation's gross sales have increased from $112,000 for the year 1934 to $2,741,168 for the calendar year 1951. There is set forth below an analysis of the various *209 classes of sales of the Silver Corporation for the years 1934 through 1951: Steel
Sugar Beet
Year
Total Sales
Warehouse
Machinery [2]
General
1951
$ 2,741,168
$1,198,471
$ 760,998
$ 781,699
1950
2,360,927
1,208,366
780,524
372,037
1949
2,105,813
904,831
943,549
257,433
1948
3,015,122
913,925
1,359,743
741,454
1947
3,038,738
806,067
1,775,023
457,648
1946
1,419,632
681,673
469,168
268,791
1945
1,921,652
618,820
224,708
1,078,124
1944
2,356,752
462,694
126,690
1,767,368
1943
1,736,567
341,650
153,142
1,241,775
1942
1,547,401
254,571
305,199
987,631
1941
701,420
245,062
88,772
367,586
1940
387,735
95,085
101,290
191,360
1939
318,459
62,372
91,191
164,896
1938
465,674
19,345
145,797
300,532
1937
498,897
355,048
143,849
1936
263,590
218,260
45,330
1935
125,378
48,416
76,962
1934
112,179
58,678
53,501
Total
$25,117,104
$7,812,932
$8,006,196
$9,297,976
*210 Since 1926, Silver has applied for a total of 13 United States patents, of which 6 had issued and 7 were pending as of December 31, 1951. Applications for foreign patents had been filed and some foreign patents obtained as of that date, based on inventions covered by the United States patents and applications. The 13 United States patent applications relate solely to four basic inventions, several applications having been filed in connection with three of the inventions in order adequately to protect the basic invention involved. The first basic invention involved a dry-cleaning machine. While assisting Joseph E. Wright to assemble a dry-cleaning machine, Silver conceived certain improvements to the process used by the machine. Silver decided to manufacture and sell a machine incorporating his ideas. Such a machine was built at Silver's expense and after demonstration was sold to Joseph E. Wright and installed in Ogden, Utah, in 1926. Silver, in the same year, applied for United States Letters Patent on his invention at his expense. In 1928, Silver obtained an order for a similar machine from Peerless Laundry Service Corporation to be installed in California, and he had the machine *211 built by the Ogden Iron Works. At the time it was installed, Silver was advised by The American Laundry Machinery Company (hereafter called American) that his machine infringed certain patent rights claimed by that company. Silver subsequently learned that a group of experimenters claimed title to the patent rights held by American. He formulated a plan of allying himself with the holders of such claims, whereby such claims and Silver's improvement would be owned by one company, and the fractional interest of each party in such assets would be represented by stock ownership. The Harold F. Silver Company (hereafter called Silver Company) was so organized and incorporated in June 1928. Silver was president and owned 74.4 percent of its outstanding stock. Prior to the time letters patent issued on Silver's invention, American contacted Silver as president of the Silver Company and offered to purchase its claims and patent application. This offer was rejected. In the fall of 1930, American renewed its offer to the Silver Company and asserted that the Silver concept was not basic and could not be used without infringing. Faced with expensive litigation, the outcome of which was in serious *212 doubt, and lacking capital to manufacture and sell the machine, the Silver Company decided to sell all of its assets to American and to obtain a release from it for any claimed infringement damages. A contract to this effect was signed and the sale consummated on December 29, 1930. At no time did Silver or the Silver Company initiate or solicit the offer or sale of its invention or claims. The second basic invention pertained to sugar beet machinery and is known as the "beet piler." While employed by OgdenIron Works, Silver became convinced of the need for improving machinery to handle sugar beets. As noted above, Silver designed and sold one such machine in 1933. In 1935, patent applications involving this invention were filed by Silver at his expense, on which applications patents were later issued. In 1934, with the organization of the Silver-Roberts Iron Works, Inc., Silver authorized that corporation to manufacture and sell machines incorporating the beet piler, and, in 1935, the corporation commenced paying royalties to Silver. Since that time, the beet piler machine has been manufactured by Silver Corporation on a royalty basis. Silver has at no time sold, transferred or *213 assigned the invention or any of the patents pertaining to the beet piler. He has always retained ownership of the invention and the patents. The third basic invention pertained to beet sugar machines and is known as the "continuous diffuser." This invention was conceived by Silver in 1939. During 1940, the Silver Corporation constructed an experimental model which worked satisfactorily. In 1942, Silver, at his own expense, filed a patent application on the continuous diffuser invention, and patents were later issued in his name. Production of this machine was delayed by World War II, but in 1944 the first machine was manufactured, sold and installed by Silver Corporation under the previously described royalty arrangement established with Silver in 1940. Manufacture and sale by the Silver Corporation under such arrangement has continued to the present time. At no time has Silver sold, assigned or transferred the invention or any of the patents pertaining to the continuous diffuser. Silver has always retained ownership of the invention and the patents. The fourth basic invention, the continuous coal miner, is the one with which we are here concerned. The continuous coal miner invention *214 was conceived by Silver in 1938 as the result of a conversation at the Denver Athletic Club with the president of a local coal mining company regarding the coal industry's need for a new type of machine for mining coal. During this and subsequent conversations, Silver suggested and made a rough sketch of the continuous coal miner. In 1940, the Engineering Department of Silver Corporation completed the formal detail drawings under Silver's supervision, incorporating the basic idea conceived by Silver in 1938. The construction of the first continuous coal miner was commenced by Silver Corporation, and, after delays occasioned by the war, was completed in 1943. The machine was based upon and incorporated Silver's basic conception of 1938 and the details embodied in the formal drawings of 1940. This machine was installed in a local mine in 1943 for testing under actual operating conditions. At the time of installation, Silver issued instructions to the mine that the machine was to remain a secret and that no persons other than employees of the mine and the Silver Corporation should have access to the machine. In June of 1946, the machine was performing its designed function satisfactorily *215 in full-time commercial operation and was used thereafter continuously in the mine in commercial production. Subsequent to June, 1946, only minor repairs were made to the machine, none of which involved any inventive processes. In 1946, Joy Manufacturing Company (hereinafter referred to as Joy), a Pennsylvania corporation, discovered from sources then unknown to Silver that he had developed a continuous coal miner. In October, 1946, it offered to acquire the invention from Silver. Silver made no reply and did not acknowledge this offer. In January, 1947, Joy renewed its efforts to acquire the continuous coal miner. It was the common expectation of both Silver and Silver Corporation that Silver would authorize the Silver Corporation to manufacture and sell the continuous coal miner on the basis that Silver would retain the ownership of the invention and would receive a royalty upon each sale. By January 1, 1947, it was apparent to Silver and the directors of Silver Corporation that it would not be feasible or desirable for Silver Corporation to attempt to manufacture and sell the continuous coal miner, because of the corporation's aforementioned financial difficulties and because *216 Silver Corporation then lacked the credit, financial structure, and sales organization required for expansion into this new field. It was therefore decided by the corporation not to undertake such manufacture and sale. On January 22, 1947, a valid and legally effective agreement was entered into by both Silver and Joy, which agreement provided, in part, as follows: "WHEREAS, Joy is a manufacturer and seller of mining machinery and is desirous of acquiring the said inventions, in securing the filing of United States and certain foreign patent applications covering all features believed to be patentable, in acquiring an assignment of the entire right, title and interest in said inventions, applications and patent or patents issuing thereon, and in manufacturing and selling devices or machines embodying said inventions to as wide an extent as marketing demand will permit; "NOW, THEREFORE, in consideration of the full and faithful performance of the covenants and conditions herein set forth and the mutual promises of this agreement, the parties have and hereby do covenant and agree as follows: "1. Silver hereby sells, assigns, transfers, grants and conveys to Joy all the right, *217 title and interest he now has or may hereafter acquire in and to any and all inventions embodied in the said combined cutting and loading machine, and all sub-combinations and parts thereof, and any and all patent applications to be filed on said inventions, and any and all letters patent of the United States and foreign countries that may be granted upon such inventions and/or applications, together with the design of said machine and all drawings, photographs and engineering data pertaining to said combined cutting and loading machine now owned or hereafter acquired by Silver. It is understood that Silver is not selling and Joy is not acquiring the experimental machine now being tested at said mine of The Consolidated Coal & Coke Company. "2. Silver agrees at Joy's expense to apply for letters patent on all of the novel subject matter of said development and embodied in the design and operation of said combined cutting and loading machine, together with any improvements subsequently made by Silver pertaining directly to said inventions or the design and operation of said machine, and to assign any such applications or patents, United States or foreign, to Joy. * * *
"4. *218 Joy agrees to use its best efforts as its facilities permit to develop the said machines, subcombinations, parts and appurtenances in suitable condition for marketing; to get such machines, subcombinations, parts and appurtenances into production promptly after they are developed, and to use the best efforts of its organization to sell such machines, subcombinations, parts and appurtenances for as long a period and as wide an extent as possible after they have been developed for the market. "5. Joy agrees, at its expense and through its attorneys, to proceed promptly with patentable novelty searches to determine the possibilities for patent protection of the several features of the aforesaid Silver development, and to follow with the preparation and filing of an adequate patent application in each instance where such search does not establish such a complete lack of patentability as to make such filing unwarranted. "6. Joy agrees to provide Silver with copies of all papers filed in or received from the Patent Office in connection with any such application, and to give due consideration to recommendations of Silver relative to prosecution of said applications. Joy also agrees to *219 diligently prosecute any application filed as provided in this agreement and to obtain issuance of a patent in due time after official allowance of any said application. * * *
"8. Silver agrees to make a full and complete disclosure of his development to Joy for use in obtaining the patent protection contemplated by this agreement and will sign all necessary papers, take all rightful oaths required in obtaining such patent protection, and otherwise will cooperate fully with Joy in the preparation and prosecution of all applications for patent, United States and foreign. Silver also agrees that during the life of this agreement he, or any company of which he is the principal stockholder, will not engage in the development or design of any equipment for third parties which shall be competitive with the inventions comprising the subject matter of this agreement, and will not manufacture or cause any such equipment to be manufactured in competition with Joy. "9. Joy agrees to pay Silver an initial payment of Forty Thousand Dollars ($40,000.00) for the sale of the inventions, machine design and operation, and patent rights enumerated herein, which sum shall be payable as follows: *220 "a. $5,000 upon the execution of this agreement: "b. $35,000 on or before ninety days from the date hereof. "In addition to said initial payments, Joy agrees to pay to Silver on each combined cutting and loading machine embodying Silver's general design or principle of operation, and repair and replacement parts therefor, manufactured and sold by Joy or manufactured and sold under its authorization, a royalty as follows: "c. From the date of this agreement until it is finally agreed that no patents are obtainable, a royalty of 5% of the net selling price of the complete machine and a royalty of 2% of the net selling price of the repair and replacement parts or appurtenances thereof. "d. If any patent is issued on an invention of Silver covering any feature of Silver's combined cutting and loading machine or function thereof, the royalty on all complete machines is 5% of the net selling price and the royalty on repair and replacement parts and appurtenances is 2% of the net selling price, and such payments shall continue until the expiration date of the last to expire of the patents on the Silver inventions. "e. If and when it is finally determined by the parties hereto *221 that no patents will issue on the aforesaid Silver inventions, the royalty on all complete machines is 2 1/2% and on repair and replacement parts and appurtenances is 2% of the net selling price, and such payments shall commence on the date of final determination and shall continue for the balance of the period of fifteen years from the date of the sale of the first machine by Joy. "10. It is understood and agreed that Joy or its subsidiaries, licensees, or assignees may manufacture and sell, as an entity or unit, sub-combinations of said combined cutting and loading machine embodying Silver's general design and principle of operation at a price fixed in accordance with Joy's standard pricing procedure. On the sale of said sub-combinations Silver shall receive a royalty as follows: "a. From the date of this agreement until it is finally agreed that no patents are obtainable on said sub-combinations, a royalty of 5% of the net selling price of said sub-combinations, and 2% of the net selling price of repair parts therefor. "b. Upon the issuance of any patent for such sub-combinations or operation thereof upon an application filed by Silver, the royalty on sub-combinations is 5% *222 of the net selling price of said sub-combinations and 2% of the net selling price of repair parts therefor. "c. When it is finally determined that no patents will issue on said sub-combinations on inventions of Silver, the royalty is 2 1/2% of the net selling price of said sub-combinations and 2% of the net selling price of repair parts therefor. Such payments shall commence on the date of final determination and shall continue for the balance of a fifteen-year period, starting with the sale of the first machine by Joy." The foregoing agreement has remained in effect and payments have been made to Silver pursuant to the above-recited provisions thereof. Joy reported such payments made in 1949 and 1951 as royalties. Silver has at no time been employed by or rendered services to Joy. Pursuant to the aforementioned agreement, Silver has cooperated with Joy in the filing of applications on patents on the continuous coal miner invention, all of which applications have been prepared and prosecuted by Joy. In accordance with Paragraph 2 of the above agreement, Silver, on August 26, 1947, executed the following assignment: "In consideration of One Dollar and other good and valuable *223 considerations, receipt of which is hereby acknowledged, I, HAROLD F. SILVER of 315 Clermont Street, Denver, Colorado hereby sell, transfer and set over and assign unto Joy Manufacturing Company, a corporation of the Commonwealth of Pennsylvania, its successors, assigns, nominees, or other legal representatives, the same to be held and enjoyed by the said Joy Manufacturing Company, for its own use and behoof, and for the use and behoof of its successors, assigns, nominees, or other legal representative, to the end of the term or terms for which such Letters Patent are or may be granted, reissued or extended, as fully and entirely as the same would have been held and enjoyed by me if this assignment and sale had not been made, all of the entire right, title and interest in and to the improvements in APPARATUS AND METHOD FOR MINING COAL OR OTHER MINERALS FROM THE SOLID invented by me and the application for United States Letters Patent therefor, Serial No. 750,981, which was executed by me May 26, 1947 and filed May 28, 1947; and all original and reissued patents granted for said improvements, and all divisions and continuations of said application, including the subjects-matter of any *224 and all claims which may be obtained in every such patent, and the right to apply for and obtain patents in countries foreign to the United States, including the right to claim for foreign applications so filed the benefits of the International Convention, and in and to any Letters Patent which may be granted thereon in such foreign countries, and I do authorize and request the Commissioner of Patents of the United States, and any official of any country or countries foreign to the United States whose duty it is to issue patents on applications as aforesaid, to issue the said Letters Patent to the said Joy Manufacturing Company, its successors, assigns, nominees or other legal representatives as assignee and owner of the said entire interest." The development expenses of the continuous diffuser and the continuous coal miner were paid for by the Silver Corporation and were treated as business expenses by that corporation in its income tax return. During the years here involved, Silver received the following net amounts from Joy pursuant to their agreement executed January 22, 1947: Year
Net Amount
1949
$ 72,700.69
1950
106,544.15
1951
51,569.10
Total
$230,813.94
*225 From 1917 through 1951, substantially all of Silver's time, apart from personal and social activities, has been devoted to his duties as employee, manager, and executive for the Silver Corporation and his previous employers. He has had no formal education as an engineer. He did not take any engineering courses while he was at the University of Utah or at Columbia University. He is not a member of any association or society of inventors, nor of any association of engineers, and he is not a licensed engineer. He was never employed to engage in research or inventive activities; his duties with his various employers have in no instance required research or inventive activities on his part; and he never undertook such activity in connection with his employment by any of his employers. The four basic inventions referred to above were Silver's only inventions and Silver never made or experimented with or attempted to make any other invention. Silver has never attempted to sell, or in any way solicited the sale of or offered for sale, any of his inventions. Silver has never received any offer to buy any of his inventions except that from Joy in respect to the continuous coal miner invention. *226 Silver has never purchased inventions from any other person, nor has he attempted to sell or dispose of the invention of any other person. At no time has Silver had a workshop at home or elsewhere. His inventive activity with respect to his dry-cleaner invention was intermittent and irregular and involved only approximately one hour every day or two over a period of three weeks in 1926. Silver's inventive activity with respect to his beet piler invention involved approximately one month in 1932. His inventive activity with respect to the continuous diffuser battery invention was intermittent and irregular over a period of one and one-half years in 1939 and 1940, the total time involved in this period not exceeding an hour or so each day for 14 days and later occasional observation during demonstrations covering a period of ten days to two weeks. Silver's inventive activity with respect to the continuous coal miner invention was intermittent and irregular over a period of two years from 1938 to 1940, the total time involved in this period not exceeding three or four meetings thereafter, an hour a day for 14 days and later four to five trips to the mine installation, spending one-half *227 a day for each trip. Silver's inventive activities lacked continuity and were intermittent and irregular, and, over the period from 1917 to 1951, were incidental to his regular occupations and consumed a relatively small portion of his time. Silver has always taken an active part in business and community activities. In 1939, Silver helped organize the Manufacturers Association of Colorado and served as its president for two terms. During World War II, he was an industry member of the Regional War Labor Board, an industry advisor of the War Manpower Commission, and a member of the Regional Board of Governors of the Smaller War Plants Corporation. Silver served as Community Chest Campaign Chairman for two years, in 1949 and 1950, as President of the Denver Area Community Chest in 1951, and as Chairman of the Board in 1952. He became a director of the Mountain States Employers Council in 1946, and has served continuously in that capacity since then. He was President of the Council in the years 1947 and 1948, and continued to serve as a member of the Executive Committee in 1949 and 1950. Silver served as a director of the National Association of Manufacturers for three terms in 1941, *228 1942, and 1943, and as a director of the Denver Chamber of Commerce from 1941 to 1944. Silver became a director of the Denver Branch of the Federal Reserve Bank of Kansas City on January 1, 1950, and later became a member of the Industrial Advisory Committee of the Federal Reserve Bank of Kansas City, a position that he still holds. In 1950, he became a director of The First National Bank of Denver, and he is still serving in that capacity. He has served as a Trustee of the University of Denver since 1946. The University of Colorado gave its "Award of Merit for Business Achievement" to Silver in 1944. This award is based upon outstanding ability as a businessman, as demonstrated by the recipient's own business, his relative position in the state with regard to other businesses, and the regard of other businessmen for the recipient. It indicates outstanding business leadership in Colorado and the cooperation with business organizations in furthering Colorado's interests. Silver was awarded a plaque in 1951 by the Colorado State Chamber of Commerce as the Outstanding Businessman of Colorado for that year. Silver had described his occupation in his Federal income tax returns variously *229 as "engineer," "mechanical engineer," "salesman," and at all times since 1934 as "executive." On all foreign patent applications for English speaking countries, Silver designated himself as "manufacturer." Silver and the accountant for Silver Corporation have customarily and regularly prepared petitioners' Declaration of Estimated Tax, due on March 15 of each year, at the same time that they prepared petitioners' Federal income tax return for the preceding year. It has been their custom and practice to have both forms signed by petitioners at the same time and mailed at the same time. To the best of the knowledge and belief of Silver and the accountant, they have never deviated from that practice, and to the best of their knowledge and belief, the final return for 1949 and the Declaration of Estimated Tax for the year 1950 were prepared, signed, and mailed at the same time. Petitioners' original Declaration of Estimated Tax for the year 1950 was stamped as received on May 1, 1950, by the office of the then collector of internal revenue. Petitioners filed an amended Declaration of Estimated Tax for the year 1950 on January 15, 1951. During the year 1950, all mail received by the *230 then collector of internal revenue was opened and stamped with the exact date of receipt. Whenever it was physically impossible to open and stamp all the mail received, each bag or tub of mail was labeled and the exact date of receipt noted, and when the mail was opened later, it was stamped with the actual date of receipt. The respondent, in the statutory notice of deficiency mailed May 14, 1953, determined that the amounts received by Silver pursuant to his agreement with Joy Manufacturing Company during the years 1949, 1950, and 1951 were ordinary income, and also that petitioners had failed to file a timely declaration of estimated tax, Form 1040-ES, for 1950 and had substantially underestimated their tax. Opinion VAN FOSSAN, Judge: The principal issue here raised involves the proper classification for tax purposes of the amounts received by Silver from Joy during the taxable period in controversy. That is to say, are such amounts to be taxed as capital gains or as ordinary income? The portion of the statute involved is Section 117(a), Internal Revenue Code of 1939. [3]
*231 Petitioners contend that the continuous coal miner invention in question constituted a capital asset to Silver; that the transaction of January 22, 1947, resulted in the complete sale of such asset to Joy, which asset had been held for a period in excess of six months; and that, therefore, any proceeds therefrom are property taxable as long-term capital gains. In defense of his determination that the amounts received by Silver from Joy are to be taxed as ordinary income, respondent advances the two-fold argument - that the invention which was the subject matter of the transaction between Joy and Silver was, in fact, property held by the latter primarily for sale to customers in the ordinary course of his trade or business and was therefore not a capital asset; and, further, that the 1947 agreement between Joy and Silver did not constitute a sale, but rather was a license agreement whereby Joy was authorized to manufacture and sell the continuous coal miner invention, the income from which license is properly taxable at ordinary rates. We find ourselves in disagreement with respondent on both counts. The expressions "business" and "in the ordinary course of * * * business" imply *232 a continuity of effort and enterprise conspicuously absent from the facts found on this record. During the period of 25 years from 1926 through December 31, 1951, Silver had conceived and reduced to practice only four basic inventions on which he has applied for 13 United States patents. Six of the patents thus applied for have been granted and as of the latter date, seven were pending. Also as of such date, some foreign patents had been obtained. Except for two occasions, the one here in question and another where special circumstances were involved, Silver sold none of his inventions or patents, but in all other instances assigned rights in the patents on a royalty basis to a corporation of which he was the directing head and in which he held considerable, if not the entire, stock interest. It is clear that such assignments were made for the purpose of achieving profitable development and exploitation of the patents involved, using the corporate structure of the assignee to finance and forward this development and exploitation. The factual situation thus found here is very different from one in which an inventor, motivated solely by the desire to obtain an immediate profit, makes *233 sales of patent rights to several purchasers in none of which the inventor has any proprietary interest. In the latter situation, the inventor may be said to be in the trade or business of selling patent rights to customers. This was the case in Harold T. Avery, 47 B.T.A. 538, upon which respondent places heavy reliance. Such a situation is clearly distinguishable from that found in the instant case. Furthermore, the Avery decision did not hold, nor is it authority for the proposition that mere licensing alone by one who does not sell or otherwise hold patents or inventions for sale, constitutes the carrying on of a business, despite language therein which may be read as suggesting such. Thus, that case is of no controlling authority here. Respondent cites, as being directly in point, Harvey v. Commissioner, 171 Fed. (2d) 952, affirming a memorandum opinion of this Court [6 TCM 312]. In that opinion the Court of Appeals for the Ninth Circuit agreed with us that certain patents involved therein did not constitute capital assets under the law applicable to the years before it, by reason of such patents being property used in the trade or business *234 of the taxpayer and subject to an allowance for depreciation. No such situation is present here. There is no evidence that the invention or patent in question was ever used in Silver's trade or business. Nor was it ever offered for sale to anyone. And this is true even if we consider the business of Silver Corporation as being that of Silver. Certain it is, Silver was not engaged in the business of making and marketing inventions. Nor did he hold the asset in question for sale to customers in the ordinary course of his trade or business. Moreover, the transaction in dispute took place prior to the issuance of patents on the invention with which we are here concerned, as is evidenced by Silver's covenant in the instrument of transfer to make application therefor. Respondent's second contention that the transaction of January 22, 1947, between Silver and Joy did not constitute a sale of the continuous coal miner thereto but only a license whereby the latter was authorized to manufacture and sell such invention, is in direct conflict with the pleadings. In this connection, respondent in his answer specifically admits "* * * said invention was sold to Joy Manufacturing Company by Harold *235 F. Silver on or after January 22, 1947, * * *." But were this not the state of the pleadings, such argument finds no support in the record. The instrument transferring Silver's interest in the invention states that "* * * Silver hereby sells, assigns, transfers, grants and conveys to Joy all the right, title and interest he now has or may hereafter acquire in and to any and all inventions embodied in the said combined cutting and loading machine, * * *." The language of the instrument of assignment and transfer and much other evidence in the record evidence clearly the unmistakable intent of Silver to part with the patent and effectively to transfer all of his rights therein save that of receiving the payment specified in such instrument. Cf. Kenyon v. Automotive Instrument Company, 160 Fed. (2d) 878, 882; Commissioner v. Celanese Corporation of America, 140 Fed. (2d) 339; Commissioner v. Hopkinson, 126 Fed. (2d) 406. We conclude, therefore, that the transaction effected on January 22, 1947, between Silver and Joy constituted the sale of a capital asset, the gain from which is taxable to petitioners as capital gain. It is our understanding *236 that no question is raised as to the length of Silver's holding period for the foregoing asset. In any event, it is clear from the stipulated facts that the invention in question had been reduced to practice for a period in excess of six months prior to its sale to Joy and that it had therefore been held by Silver for longer than six months. Edward C. Myers, 6 T.C. 258; Samuel E. Diescher, 36 B.T.A. 732, affd. 110 Fed. (2d) 90. This being true, the capital gain derived by Silver from the sale thereof to Joy on January 22, 1947, was long-term capital gain and is, accordingly, so taxable. Respondent's determination to the contrary is reversed. The final question in dispute is whether petitioners filed a timely declaration of estimated tax for the year 1950. That petitioners were required to file such declaration is not denied. Nor do petitioners deny that the filing thereof was due on or before March 15, 1950. But, the declaration of estimated tax form for the taxable year 1950 purporting to be that of petitioners and submitted in evidence as part of the stipulation filed herein bears a stamp as having been received by the then collector for *237 the district of Colorado on May 1, 1950. Moreover, there is on this record no probative evidence tending to show such date of receipt to be in error. Thus, as to this issue, there is a complete failure of proof of error. Albeit it had always been petitioners' custom to prepare, sign and file the requisite declaration of estimated tax for a particular year at the same time as they prepared, signed and filed their income tax returns for the preceding year, and, moreover, to the best of their knowledge and belief, they have never deviated from such practice, nevertheless, there is no showing on the record made that such procedure was actually followed in the year in dispute. To the contrary, what evidence there is points to the opposite conclusion. Accordingly, respondent's determination as to this item is sustained. Decision will be entered under Rule 50. Footnotes
1. Internal Revenue Code of 1939.↩
2. Sales of this class represent sales of machinery incorporating inventions of Silver manufactured on a royalty basis. Sales listed under the columns captioned "Steel Warehouse" and "General" relate to products and machinery not incorporating Silver's inventions.↩
3. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (A) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *.↩