Edward C. Myers, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 6037.    Promulgated February 26, 1946.

*Harvey W. Peters, Esq.*, for the petitioner.
*Carroll Walker, Esq.*, for the respondent.

261

**OPINION.**

BLACK, *Judge*: In this proceeding the parties are in agreement as to the amount which petitioner received from Goodrich in 1941. Petitioner does not contend that he had any unrecovered cost basis of his invention in the taxable year and he concedes that all that he received from Goodrich was gain. The issue is, What kind of gain? The Commissioner contends that the amount which petitioner received from Goodrich was royalty payments for the use of a patent and is, therefore, ordinary income and 100 percent taxable. Petitioner contends that the payments were received from the sale of a patent to Goodrich in 1932 and that the gains are taxable at capital gain rates.

The applicable statute is section 117 of the Internal Revenue Code, part of which is printed in the margin.[1]

The determination of these respective contentions, it seems to us, depends upon the answers to three questions which are more or less related: (1) Did the agreement with Goodrich entered into January 9, 1932, amount to a sale by petitioner of his invention to Goodrich, with payments to be made annually, as petitioner contends, or was it a mere license to Goodrich of rights in petitioner's invention for payment of royalties, as the Commissioner contends? (2) If question (1) is answered that the agreement amounted to a sale, then, was the sale one of property which petitioner had owned for a period of 24 months prior to January 9, 1932? (3) If question (2) is answered in the affirmative, then, was the property which petitioner sold to Goodrich a capital asset within the meaning of section 117 (a), *supra?* We shall take up these three questions in their order.

As to question (1), it is petitioner's contention that the agreement of January 9, 1932, between petitioner and Goodrich, whereby petitioner granted to Goodrich the entire monopoly and property rights that he had in his invention and improvement of the rubber-covered flexible steel track, effected a sale of petitioner's invention to Goodrich. One of the leading authorities dealing with the transfer of patents is *Waterman* v. *Mackenzie*, 138 U. S. 252, which petitioner cites in his brief. In that case the Supreme Court, among other things, said:

Whether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but

[1] SEC. 117. CAPITAL GAINS AND LOSSES [as amended by sections 212 and 214, 1939 Act, and section 115, 1941 Act].

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), or an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue;

\*        \*        \*        \*        \*        \*        \*

(4) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 18 months, if and to the extent such gain is taken into account in computing net income;

\*        \*        \*        \*        \*        \*        \*

(8) NET LONG-TERM CAPITAL GAIN.—The term "net long-term capital gain" means the excess of long-term capital gains for the taxable year over the long-term capital losses for such year;

\*        \*        \*        \*        \*        \*        \*

(b) PERCENTAGE TAKEN INTO ACCOUNT.—In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net income:

100 per centum if the capital asset has been held for not more than 18 months;

66⅔ per centum if the capital asset has been held for more than 18 months but not for more than 24 months;

50 per centum if the capital asset has been held for more than 24 months.

upon the legal effect of its provisions. For instance, a grant of an exclusive right to make, use and vend two patented machines within a certain district is an assignment, and gives the grantee the right to sue in his own name for an infringement within the district, because the right, although limited to making, using and vending two machines, excludes all other persons, even the patentee, from making, using or vending like machines within the district. *Wilson* v. *Rousseau*, 45 U. S. 4 How. 646, 686. On the other hand, the grant of an exclusive right under the patent within a certain district, which does not include the right to make, and the right to use, and the right to sell, is not a grant of a title in the whole patent right within the district, and is therefore only a license. Such, for instance, is the grant of "the full and exclusive right to make and vend" within a certain district, reserving to the grantor the right to make within the district, to be sold outside of it. *Gayler* v. *Wilder*, above cited. So is a grant of "the exclusive right to make and use," but not to sell, patented machines within a certain district. *Mitchell* v. *Hawley*, 83 U. S. 16 Wall. 544. So is an instrument granting "the sole right and privilege of manufacturing and selling" patented articles, and not expressly authorizing their use, because, though this might carry by implication the right to use articles made under the patent by the licensee, it certainly would not authorize him to use such articles made by others. *Hayward* v. *Andrews*, 106 U. S. 672. See also *Oliver* v. *Rumford Chemical Works*, 109 U. S. 75.

The *Waterman* v. *Mackenzie* case has been followed in a large number of later cases and was reiterated in substantially the above language by the Supreme Court in *United States* v. *General Electric Co.*, 272 U. S. 476. In the *Waterman* case, after a full discussion of the principles involved, the Supreme Court held that an agreement by which the owner of a patent for an invention grants to another person "the sole and exclusive right and license to manufacture and sell" the patented article throughout the United States (not expressly authorizing him to use it) is not an assignment, but a license, and gives the licensee no right in his own name to sue a third person at law or in equity for an infringement of the patent. It will be observed that the license in the *Waterman* case gave the licensor the right to manufacture and sell the invention, but did not expressly authorize the licensor to use it. It was the absence of this latter factor which caused the license agreement to fall short of being a sale and made it, as the Court said, "a mere license." In the instant case, the license agreement gave to Goodrich an exclusive license "to make, use, and sell throughout the United States, its territories and possessions" petitioner's invention. Thus the agreement in the instant case was sufficient in respect of the factor wherein the agreement present in the *Waterman* case fell short.

In *Parke, Davis & Co.*, 31 B. T. A. 427, we held that an agreement between Parke, Davis & Co., as licensor, and Eli Lilly & Co. as licensee, amounted to a sale by Parke, Davis & Co. to Eli Lilly & Co. of a one-half interest in certain patents which it owned and that the $612,150 which the taxpayer received in the transaction from Eli Lilly & Co. was a return of capital, as the taxpayer contended, and was not ordi-

nary income, as the Commissioner contended. In so holding, among other things, we said:

The fact that in the contract through which this result was reached the parties were termed "Licensor" and "Licensee" is of no consequence. [Citing authorities.] The rights granted or surrendered determine the character of the instrument to have been an absolute conveyance of a one-half beneficial interest in the Colton patents for $612,150. We hold that only the excess of that amount over $612,128.86, petitioner's stipulated basis for the interest conveyed to Eli Lilly & Co., is taxable income to petitioner.

In the instant case, as we have already pointed out, petitioner concedes that in prior years he has already recovered all the cost basis of his invention and that all he received from Goodrich in 1941 represented gain. But he contends that it represents gain from the sale of capital assets, and in this we think he must be sustained under the authorities cited above. See also *Commissioner* v. *Hopkinson*, 126 Fed. (2d) 406, affirming 42 B. T. A. 580.

The Commissioner, in his brief, strongly argues that the agreement between petitioner and Goodrich was not a purchase and sale because in paragraph 8 of the agreement the petitioner reserved the option to terminate the agreement if a certain amount of royalties was not paid to petitioner in any one calendar year; and because in paragraph 10 Goodrich was given the right under certain conditions named therein to terminate the agreement upon the happening of such events. Says the Commissioner on this point:

The reservation of both the Licensor and the Licensee to terminate the agreement is incompatible with the claim that a sale was made. "A sale of personal property, when completed, transfers to the purchaser the title to the property sold." *Whitefield* v. *United States*, 92 U. S. 165.

We have carefully examined into this point raised by the Commissioner, and we find it is not well taken. The conditions in the agreement which the Commissioner urges as a basis for his contention are, in our opinion, conditions subsequent and, under the authorities we have cited, did not interfere with the passing of ownership from petitioner to Goodrich. The conditions subsequent in the agreement in the instant case were no different in substance from those which were present in *Commissioner* v. *Celanese Corporation*, 140 Fed. (2d) 339. In that case the court ruled against the Government and held that such conditions subsequent did not show that the contract was merely a licensing agreement so as to make the payments under contract "royalties" instead of payments of part of the purchase price of the patents. We make the same holding here. Cf. *Green* v. *Le Clair*, 24 Fed. (2d) 74.

Having decided question (1) in petitioner's favor, we next take up question (2), which is, Did petitioner, by the agreement of January 9, 1932, sell to Goodrich property which he had owned and held for 24

months prior to the date of sale? Petitioner's invention was not patented at the time of sale. In fact application for a patent had not at that time been filed. The application for patent was filed by petitioner January 25, 1932, and the patent was granted December 31, 1935. But petitioner's invention and improvement of the rubber-covered flexible steel track was completely conceived prior to January 1, 1930. Petitioner has proved, clearly enough we think, the completed conception of his invention prior to January 1, 1930, by drawings made, signed, and dated by him, which drawings set forth the invention in sufficient detail to enable those skilled in the art to manufacture the invention and improvement without further application of the inventive act. In *Standard Cartridge Co.* v. *Peters Cartridge Co.*, 77 Fed. 630, the court stated:

If such persons, from these sketches, could construct a machine containing the improvements conceived by Ligowsky, without the further exercise of the inventive faculty, then it is very clear that Ligowsky must be held to have had a sufficient conception in 1887 to entitle him on a question of priority, to carry the date of the invention back to the date of these drawings.

In *Samuel E. Diescher*, 36 B. T. A. 732, we held that an inventor's property right in his invention does not come into being upon his obtaining a patent, but exists prior to that time upon his reduction of an original invention to actual practice. In so holding, among other things, we said:

We think, therefore, that petitioners had a property right in each of the inventions which they had reduced to practice. These rights represented something of exchangeable value which the partnership possessed since it was able to exchange them for a valuable consideration. [Citing cases.] That answers the only question presented here. So, we conclude that these particular patents and inventions perfected and demonstrated more than two years prior to September 28, 1932, constituted property owned by the partnership for more than two years.

In the instant case we think the evidence clearly shows that petitioner, at the close of 1929, had an invention that was ready for manufacture and use. He had conducted the necessary experiments to know that the invention could be manufactured and had gone into every detail of the invention, even considering the vehicles and carriage construction of such vehicles, to permit the adoption of his invention to various types of vehicles. By the close of 1929 petitioner had completely set forth the details of his invention in drawings. These drawings, which were completed in December 1929, were included in the application for patent which was filed January 25, 1932, and in the patent which was subsequently granted. Therefore, when petitioner sold his invention to Goodrich on January 9, 1932, by means of an exclusive license to Goodrich to use, manufacture, and sell the rubber-covered flexible steel track of which he was the inventor, he sold property which he had

owned and held for more than 24 months prior to the date of sale. Therefore, we answer question (2) in petitioner's favor.

This brings us to question (3) which is, Was the property which petitioner sold to Goodrich a capital asset within the meaning of section 117 (a) of the Internal Revenue Code? Respondent contends that it was not a capital asset, but was "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Respondent relies on *Harold T. Avery*, 47 B. T. A. 538. In that case the taxpayer, during a period of about 17 years, procured about 12 patents on inventions developed outside his regular hours of employment. Certain of his inventions led to his employment by a manufacturer of calculating machines and, following his employment, he sold to such employer two inventions for which applications for patent had been made. Under the facts in that case, we held that the patent which the taxpayer sold in 1935 was property held by him "primarily for sale to customers in the ordinary course of his trade or business" and that the gain realized from such sale was taxable as ordinary income and not as capital gain. The facts in the instant case, we think, are distinguishable. Petitioner had been engaged over a period of years in engineering and sales promotion work. He was employed by others at a salary. Petitioner, during this time, conceived an invention and thereby acquired a property right thereto. He might have made an effort to manufacture and sell the invention and improvement himself. In fact he testified that at one time he considered doing so but decided that his financial resources were not adequate. Instead, he chose to convert his property right by transferring it to Goodrich in exchange for a contract providing payment of determinable annual sums. By thus transferring his one and only invention to Goodrich, petitioner was not transferring property held primarily for sale to customers in any trade or business conducted by him. On this point see *Samuel E. Diescher, supra*, at page 743.

We answer question (3) in favor of petitioner's contention that the invention which he sold to Goodrich was a capital asset within the meaning of section 117 (a) and the gain received in 1941 from Goodrich is taxable as capital gain. Cf. *Commissioner* v. *Hopkinson, supra*.

*Decision will be entered under Rule 50.*