Monie S. Hudson and Alma S. Hudson v. Commissioner.
Hudson v. Commissioner
Docket No. 58726.
United States Tax Court
T.C. Memo 1956-60; 1956 Tax Ct. Memo LEXIS 236; 15 T.C.M. (CCH) 284; T.C.M. (RIA) 56060; March 14, 1956
*236 Income from invention: Capital gain or ordinary income. - Grant by inventor of the right to make, use, and sell his invention (which was later patented) held to constitute a sale of the invention and the amounts received thereunder are taxable as capital gains. Edward C. Myers, 6 T.C. 258, followed. L. C. Dodge, C.P.A., 805-7 Montgomery Building, Spartanburg, S.C., for the petitioners. Raymond Whiteaker, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax for the years 1951 and 1952 in the amounts of $668.94 and $793.36, respectively. The principal question presented is whether certain payments received by petitioner, Monie S. Hudson, constituted royalties, taxable as ordinary income, or proceeds from *237 the sale of a capital asset, taxable as long-term capital gain. A subsidiary issue relating to the amount of deductions allowable on account of medical expenses depends upon the amount of adjusted gross income, which will be determined by the decision of the principal issue. Findings of Fact Part of the facts are stipulated and are found as stipulated. Monie S. and Alma S. Hudson were in 1951 and are at the present time husband and wife and reside in Spartanburg, South Carolina. They filed a joint income tax return for the year 1951 with the collector of internal revenue, and a joint return for the year 1952 with the director of internal revenue, both for the district of South Carolina. Alma S. Hudson appears as a petitioner only by reason of having joined in the income tax returns. Monie S. Hudson, hereinafter sometimes called the petitioner, was employed from February 5, 1934 until January 1, 1955, as a chemist by Taylor-Colquitt Company, a South Carolina corporation. During the years 1934 to 1940 while an employee of the Taylor-Colquitt Company, the petitioner devised a method for the processing of wood and filed an application for a patent on that invention on March 19, 1940. United *238 States Patent No. 2,273,039, covering the petitioner's invention, was issued on February 17, 1942. The Taylor-Colquitt Company claimed all rights to the invention since it was developed by the petitioner while in the employ of that company. The petitioner claimed to be the sole owner of the patent with the exception of shop-rights and this point was finally conceded by the Taylor-Colquitt Company. On October 23, 1940, an agreement with respect to the invention was entered into between the petitioner and the Taylor-Colquitt Company under which the petitioner as "Licensor" granted to the Taylor-Colquitt Company as "Licensee" a license to use the process in its plants wherever located and "to make, use and sell the apparatus and the products thereof" under the petitioner's application for a patent and under any reissues of patents. The agreement contained no limitation as to time or territory. The license was "to be exclusive in Licensee as to all persons" except that the petitioner reserved to himself the right "only to use the process" for his own personal use, but not to practice the invention for third parties, or to sell or otherwise dispose of the products thereof. The agreement *239 further granted "to Licensee corresponding rights in all foreign countries" in which the licensee might elect to file applications at its expense. The licensee was given the right to grant sublicenses on any terms and conditions that it desired in this country and in foreign countries. The licensee agreed to proceed against patent infringers at its own expense and the licensor agreed to permit the use of his name as a party plaintiff in any suit. Any recoveries for infringement were to be divided between the licensor and licensee in the same manner as royalties from sublicensees. The licensee was given the exclusive right to negotiate and effect settlement of questions of infringement of any patents that might be issued on the petitioner's invention. The consideration for the agreement was the stated sum of $10 and the agreement of the licensee to pay to the licensor amounts based on the quantities of wood treated by the licensee and its sublicensees. In any year in which the quantity of wood treated by the licensee did not exceed the quantity that was treated by its sublicensees the licensee was to pay to the licensor 27 1/2 per cent of the gross royalties received from sublicensees, *240 and on the wood treated by it the licensee was to pay 27 1/2 per cent of an amount calculated by applying to the quantity of wood treated by it, the average rate of royalties per cubic foot paid to it by its sublicensees. In any year in which the quantity of wood processed by the licensee exceeded the quantity processed by its sublicensees the licensee was to pay a sum equal to one cent per cubic foot of wood processed by the licensee and by its sublicensees. In either event, payments were to be no less than specified minimum amounts. Minimum payments under the agreement were to be in the amounts of $1,000 for the second year after the execution thereof, with an increase of $1,000 each succeeding year through the sixth year in which year and in each year thereafter the minimum was to be $5,000. The agreement was subject to cancellation by the licensor in the event that payments by the licensee were in arrears for 60 days, and by the licensee on 60 days' written notice. On January 1, 1948, the parties to the above agreement entered into a supplemental agreement which changed the provisions as to the expenses to be borne by the parties in connection with the prosecution of the application *241 for a patent and all divisional, continuation and reissue applications and the filing and prosecution of foreign applications. It was also agreed to change the method of calculating the payments. The amendment provided that if the quantity of wood processed by the licensee in any year was more than double the quantity processed by sublicensees, the licensee was to pay to the licensor one cent per cubic foot of wood processed by it, plus 27 1/2 per cent of the gross royalties it received from sublicensees. The supplemental agreement expressly provided that in all other respects the earlier agreement should remain unchanged and in full force and effect. The petitioner received no income from the patent until March 1946. In the years 1948, 1949 and 1950 the petitioner received from Taylor-Colquitt Company under the agreement of October 23, 1940, and the supplemental agreement of January 1, 1948, the amounts of $3,908, $5,000 and $5,000, respectively. In the taxable years 1951 and 1952 the petitioner received $5,771.05 and $6,201.20, respectively, from the Taylor-Colquitt Company under the above agreements, which sums were reported in the joint income tax returns as capital gains. *242 In December 1954, Taylor-Colquitt Company formed the TaCo Corporation and by written conveyance it transferred to the TaCo Corporation all the rights and benefits that had been granted to it by the petitioner in the agreement of October 23, 1940, as amended by the agreement of January 1, 1948. On December 8, 1954, the petitioner by endorsement on the agreement between Taylor-Colquitt Company and TaCo Corporation approved and concurred therein. The petitioner's approval of and concurrence in the assignment agreement was made at the request of the president of Taylor-Colquitt Company and his counsel. In 1953, V. K. Dell became the exclusive sublicensee of the patent pursuant to an agreement with Taylor-Colquitt Company. In March 1955, Dell paid approximately $27,000 to TaCo Corporation under his agreement with Taylor-Colquitt Company. The petitioner claimed to be entitled to a portion of that sum under his agreement with Taylor-Colquitt Company. A suit was filed on June 30, 1955, by TaCo Corporation against the petitioner to determine the petitioner's rights in this respect under his agreement with the Taylor-Colquitt Company. The payments received by the petitioner from Taylor-Colquitt *243 Company in the years 1948, 1949 and 1950 were treated by him and by the respondent as income from the sale of capital assets. The payments received by the petitioner in 1951 and 1952 from the Taylor-Colquitt Company were treated by him in the joint income tax returns as income from the sale of capital assets. The respondent determined that they were ordinary income, and increased adjusted gross income accordingly. For the year 1951 the petitioners claimed $1,041.83 as an allowable medical expense deduction. The respondent in his deficiency notice reduced the allowable medical expense deduction for the year 1951 to $897.56 by reason of his determination increasing adjusted gross income for that year. For the year 1952 the petitioners claimed an allowable medical expense deduction in the amount of $820.68, which the respondent reduced to $665.65 as a result of his determination increasing adjusted gross income for that year. Opinion The principal question presented here is the nature of the income represented by payments that the petitioner, Monie S. Hudson, received from the Taylor-Colquitt Company under the agreement of October 23, 1940, as amended. The petitioners reported the *244 payments as long-term gain from the sale of a capital asset, pursuant to section 117 of the Internal Revenue Code of 1939. The respondent determined that they were royalties and taxable as ordinary income. The respondent does not question that the invention was a capital asset and that it was held by the petitioner for more than six months prior to the date of the agreement. The petitioners do not claim that the amounts received should be reduced by any unrecovered basis. The facts in this case are strikingly similar to those involved in Edward C. Myers, 6 T.C. 258. Here, as there, the inventor granted an exclusive license to make, use and sell the invention, together with the right in the licensee to grant sublicenses. Here, as there, the inventor retained the right to terminate the contract upon the failure of the licensee to make the agreed payments and the licensee had the right to terminate the agreement upon specified written notice. Here also, as there, the licensee had the right to sue for infringement, and the licensor agreed to permit the use of his name as a party plaintiff. Here, also, as there, the original agreement was later amended to alter the amounts *245 to be paid to the inventor. In both cases the amounts of the payments were to be determined on a unit basis, but with a specified floor under the amount of the annual payments. In the Myers case we held, after a careful analysis of various cases cited and quoted therein, that the grant of an exclusive license to make, use, and sell an invention throughout the United States, its territories, and possessions, constitutes a sale of the invention, and that the amounts received constituted capital gain, rather than ordinary income. We there specifically held that the reservation of rights by the licensor and the licensee to terminate the agreement, similar to such rights involved in the instant case, were conditions subsequent and did not render the contract a mere licensing agreement. See also Kronner v. United States (Ct. Cl. 1953), 110 Fed. Supp. 730. The Myers case has been consistently followed by this Court and the same result on similar facts has been reached in cases in other courts. See Vincent A. Marco, 25 T.C. - (December 16, 1955), and cases cited therein. The cases *246 upon which the respondent relies are distinguishable from the one before us. The distinctions were set out in the opinion in the Marco case, and the cases cited therein, notably Kronner v. United States, supra, and need not be repeated here. A factual difference between this case and the Myers case is that in this case the inventor reserved to himself the right to use the process for his own personal use. This reservation was circumscribed by provisions that he did not have the right to practice the invention for third parties or to sell or otherwise dispose of the products thereof. No contention was raised that this reservation distinguishes the instant case from the Myers and other similar cases. In any event, it is our opinion that such a reservation does not render the transaction a mere license rather than a sale. Evans v. Kavanagh (D.C.E.D. Mich., 1949) 86 Fed. Supp. 535, affd. (C.A. 6, 1951) 188 Fed. (2d) 234. Upon authority of the cases cited herein, we hold that the amounts received by the petitioner in the taxable years constituted long-term *247 capital gains and were properly treated as such in the income tax returns. The respondent erred in treating them as ordinary income. On the issue of the amounts deductible on account of medical expenses, the only one of the facts enumerated in section 23(x) of the 1939 Internal Revenue Code that is involved is the amount of adjusted gross income. The deductions claimed by the petitioners were computed by treating income from the invention as long-term capital gain. The respondent by treating that income as ordinary income increased adjusted gross income which had the result of decreasing the allowable medical expense deductions. As we have sustained the petitioners' treatment of the income as longterm capital gain, it follows that the respondent erred in reducing the amounts allowable as medical expense deductions. Decision will be entered for the petitioners.