LEONARD COPLAN AND RAYE COPLAN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59283.    Filed September 20, 1957.

*Morton Held, Esq.*, for the petitioners.
*John F. Walsh, Esq.*, for the respondent.

### OPINION.

RAUM, *Judge:* The Commissioner determined deficiencies in petitioners' income tax and an addition to tax as follows:

| Year | Deficiencies | Addition to tax, sec. 294 (d) (2) |
| --- | --- | --- |
| 1951 | $9,687.70 | $875.07 |
| 1952 | 12,934.96 | |
| 1953 | 8,068.46 | |

The principal question for decision is whether certain payments received by petitioner Raye Coplan pursuant to an agreement transferring patent rights are ordinary income or capital gain.  Leonard Coplan is Raye's husband and is also a petitioner because they filed joint returns for the years in question.  The facts have been stipulated.

Raye is the inventor of a device for the simplified operation of marionettes.  On March 10, 1947, she filed an application for a patent, which was issued to her on May 23, 1950.  During all relevant times she held no other patent.

A New York corporation named Peter Puppet Playthings, Inc., was organized on April 21, 1947.  Five shares were issued to each of petitioners for $50, and five shares to each of two other persons, Rene and Lillian Schenker, for $2,500.  The Schenkers were not related to petitioners.  No other shares were issued.  On April 1, 1949, the Schenkers sold their 10 shares to the Coplans for a total consideration of $6,500, and thereafter each petitioner owned 50 per cent of the issued and outstanding stock.

By an agreement dated May 23, 1950, but notarized January 8, 1951, Raye assigned the patent to the corporation.  It provided in part as follows:

1. ASSIGNOR hereby assigns the entire right, title and interest in and to said patent to ASSIGNEE for the entire life of said patent.

\*          \*          \*          \*          \*          \*          \*

3. ASSIGNEE agrees to pay ASSIGNOR Twenty-five Thousand Dollars ($25,000.00) for this assignment and a five per cent (5%) royalty starting January 1, 1951 on the net sales.

\* \* \* \* \* \* \*

5. In case ASSIGNEE becomes bankrupt, makes an assignment for the benefit of the creditors or becomes insolvent or fails to pay a minimum royalty of Two Hundred and Fifty Dollars ($250.00) for any quarter, upon written request by ASSIGNOR, ASSIGNEE will reassign the patent No. 2,509,135 to ASSIGNOR together with all license agreements or other interests ASSIGNEE may have therein.

In August 1953, Raye entered into a further agreement with the corporation, purportedly clarifying an ambiguity in paragraph 3 of the agreement of May 23, 1950. As rewritten in the new agreement, paragraph 3 provides:

In consideration of the assignment, the assignee (Peter Puppet Playthings, Inc.) agrees to pay to the assignor (Raye Coplan) the sum of Twenty five Thousand ($25,000.) Dollars for the year 1950 or Five (5%) per cent of the net sales conducted by the assignee for the year 1950 whichever sum is the lesser; commencing January 1, 1951 and thereafter throughout the entire term of the patent and any renewal thereof, a sum equal to Five (5%) per cent of the net sales conducted by the assignee during each calendar year against a minimum guaranty of One Thousand ($1,000.) per year.

During the years 1951, 1952, and 1953 substantially all of the business of the corporation consisted of sales of marionettes. In its Federal income tax returns for the taxable years 1951, 1952, and 1953, the corporation reported the following information with respect to the positions held by petitioners, the salaries paid to them, the time they devoted to the corporation's business, and the percentage of stock which each owned:

| Year | Officer | Position | Salary | Time devoted | Percentage of stock |
|------|---------|----------|--------|--------------|---------------------|
| 1951 | Leonard Coplan | President | $21,910.77 | All | 50 |
| 1951 | Raye Coplan | Treasurer | 7,800.00 | All | 50 |
| 1952 | Leonard Coplan | President | 25,563.52 | All | 50 |
| 1952 | Raye Coplan | Treasurer | 10,600.00 | All | 50 |
| 1953 | Leonard Coplan | President | 15,200.00 | All | 50 |
| 1953 | Raye Coplan | Treasurer | 7,600.00 | All | 50 |

Petitioners' tax returns indicate that the corporation paid no dividends in the years in question.

Peter Puppet Playthings, Inc., paid $29,668.60, $37,926.17, and $28,081.74 to Raye Coplan in the years 1951, 1952, and 1953, respectively, pursuant to the agreement of assignment. On their income tax returns for the taxable years 1951, 1952, and 1953, petitioners treated these amounts as capital gain. Respondent determined that the amounts were taxable as ordinary income.

If we understand the Government's position correctly, it is that there was no "sale or exchange" within the meaning of section 117 (a) (4) of the 1939 Code. However, it is plain under the decided cases that a transfer such as the one now before us is sufficient to meet the requirements of a "sale." *Edward C. Myers*, 6 T. C. 258; *Vincent A. Marco*, 25 T. C. 544; *Rose Marie Reid*, 26 T. C. 622; *Roy J. Champayne*, 26 T. C. 634, 646–647; *Rollman* v. *Commissioner*, 244 F. 2d 634 (C. A. 4), reversing 25 T. C. 481; *Massey* v. *United States*, 226 F. 2d 724 (C. A. 7); *Watson* v. *United States*, 222 F. 2d 689 (C. A. 10); *United States* v. *Carruthers*, 219 F. 2d 21 (C. A. 9); *Allen* v. *Werner*, 190 F. 2d 840 (C. A. 5); *Hofferbert* v. *Briggs*, 178 F. 2d 743 (C. A. 4).

The problem in recent years has sometimes been identified with the *Myers* case, *supra*, and the varying administrative positions taken by the Internal Revenue Service have revolved around its vacillating determination either to follow or not to follow the *Myers* case. Shortly after the decision in the *Myers* case itself the Commissioner announced his acquiescence. 1946–1 C. B. 3. Thereafter, on March 20, 1950, he withdrew his acquiescence, and substituted a nonacquiescence, but announced that he would not apply the new ruling to royalties received during years beginning prior to June 1, 1950. Mim. 6490, 1950–1 C. B. 9. Congress thereupon undertook to deal with the problem legislatively in section 1235 of the 1954 Code, which made clear that in certain types of situations an inventor or "holder" of a patent might obtain capital gains treatment upon disposition of the patent. See S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 438–441. In effect, Congress approved the *Myers* decision in the circumstances set forth. Thereupon, the Commissioner issued another ruling, Rev. Rul. 58, 1955–1 C. B. 97, in which he announced that he would apply the new statute to payments received in 1954 and subsequent years, but that he would continue to apply his 1950 ruling to payments received in taxable years beginning after May 1, 1950, and before January 1, 1954. This provoked Congress into taking further action in 1956, and it amended section 117 of the 1939 Code so as to add a new subsection, (q), which in substance established the same rule for taxable years beginning after May 31, 1950, as was applicable under the 1954 Code. See H. Rept. No. 1607, 84th Cong., 1st Sess., 1956–2 C. B. 1226; S. Rept. No. 1941, 84th Cong., 2d Sess., 1956–2 C. B. 1227. The new provisions are set forth in the margin.[1]

---

[1] Act of June 29, 1956 (Pub. L. 629, 84th Cong., 2d Sess.), 70 Stat. 404:

Be it enacted * * *, That section 117 of the Internal Revenue Code of 1939 (relating to capital gains and losses) is hereby amended by adding at the end thereof a new subsection as follows:

(q) TRANSFER OF PATENT RIGHTS.—

(1) GENERAL RULE.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein

Since the years before us, 1951–1953, fall within the period covered by the new legislation, it is apparent that petitioners would prevail if the conditions of the new subsection (q) were met. However, since the corporation was wholly owned by petitioners, it is clear from paragraph (3) (B) of subsection (q) that these provisions do not accord capital gains treatment to the transfer in controversy. Petitioners do not contend otherwise.

Conceivably, the Government could argue that the new provisions were intended to provide the exclusive method of dealing with the problem, and, if they should fail to grant the desired capital gains treatment, that would be the end of the problem. Considerable support for that position could be found in the legislative history, where the inventor transfers the patent to a controlled corporation. See S. Rept. No. 1622, *supra*, at 441. However, there are other indications in the same legislative materials pointing the other way, and the Commissioner in his brief in the present case has made clear to us that he does not contend that section 117 (q) operates to require the royalties herein to be taxed as ordinary income. That position is in accord with a position taken by him in regulations which he proposed to issue with respect to section 1235 of the 1954 Code.[2]

Accordingly, since there is no issue before us as to the effect of the new legislation, we are faced with the problem of deciding this case

which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

    (A) payable periodically over a period generally coterminous with the transferee's use of the patent, or

    (B) contingent on the productivity, use, or disposition of the property transferred.

  (2) "HOLDER" DEFINED.—For purposes of this subsection, the term "holder" means—

    (A) any individual whose efforts created such property, or

    (B) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither—

      (i) the employer of such creator, nor

      (ii) related to such creator (within the meaning of paragraph (3)).

  (3) EXCEPTIONS.—This subsection shall not apply to any transfer described in paragraph (1)—

    (A) by a nonresident alien individual, or

    (B) between an individual and any related person.

For purposes of this paragraph, the term "related person" means a person, other than a brother or sister (whether of the whole or half blood), with respect to whom a loss resulting from the transfer would be disallowed under section 24 (b).

  (4) APPLICABILITY.—This subsection shall apply with respect to any amount received, or payment made, pursuant to a transfer described in paragraph (1) in any taxable year beginning after May 31, 1950, regardless of the taxable year in which such transfer occurred.

[2] See 21 Fed. Reg. 3080–3081 (1956) :

SEC. 1.1235–1 (b). *Scope of section 1235.* If a transfer is not one described in paragraph (a) of this section, section 1235 shall be disregarded in determining whether or not such transfer is the sale or exchange of a capital asset. For example, a transfer by a person other than a holder or a transfer by a holder to a related person is not governed by section 1235. The tax consequences of such transfers shall be determined under other provisions of the internal revenue laws.

upon the basis of the principles heretofore considered in this type of case. And, applying those principles, we must hold for petitioners. Certainly, we are not disposed to reexamine the *Myers* case. It has been followed in too many cases, and has become too firmly imbedded in the law to justify reopening the issue at this time. Nor are we prepared to accept the Commissioner's argument that the transfer here to petitioners' corporation was a sham, cf. *Albert E. Crabtree*, 22 T. C. 61, affirmed 221 F. 2d 807 (C. A. 2). We are satisfied, on this record, that the transfer was not lacking in bona fides, and that there is not present here the combination of circumstances that led us to reach the result that we did in the *Crabtree* case. Cf. *Roy J. Champayne*, 26 T. C. 634.

Other issues that were not contested will be disposed of in the—

*Decision to be entered under Rule 50.*