*Decision will be entered under Rule 50.*

HERBERT C. JOHNSON AND EDNA A. JOHNSON, PETITIONERS, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60342. Filed June 24, 1958.

*Raymond H. Schultz, Esq.,* and *David C. Kenyon, Esq.,* for the petitioners.

*Charles B. Wolfe, Jr., Esq.,* for the respondent.

FISHER, *Judge:* Respondent determined income tax deficiencies and additions to tax as follows:

| .Year | Deficiency | Additions to tax under sec. 291 (a) |
|---|---|---|
| 1951 | $5,295.67 | |
| 1952 | 4,140.60 | $207.03 |
| 1953 | 7,691.80 | |

The principal issue before the Court is whether certain payments received by petitioner Herbert C. Johnson in connection with the transfer of a patent to a corporation of which he owned all of the common stock, and his immediate family owned all the preferred stock, are taxable as ordinary income or as long-term capital gains. Edna A. Johnson is Herbert's wife and is also a petitioner because they filed joint returns for the years in question.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are incorporated herein by reference.

Petitioners Herbert C. and Edna A. Johnson are residents of Wilmette, Illinois. They filed joint Federal income tax returns as follows:

| Year | Date filed | Place filed |
|---|---|---|
| 1951 | Mar. 14, 1952 | Collector of internal revenue, 1st district, Illinois |
| 1952 | Mar. 24, 1953 | District director of internal revenue, Chicago, Illinois. |
| 1953 | Mar. 15, 1954 | District director of internal revenue, Chicago, Illinois. |

Herbert C. Johnson (hereinafter referred to as petitioner) entered into the tool and diecasting design business in his individual capacity in 1923. Prior to that date he was employed as a draftsman and engineer by the Alemit Die Casting Co. From 1923 to December 17, 1941, Johnson conducted his business under the name National Die Casting Company. Johnson's business was primarily that of a job shop or custom manufacturer, that is, making diecasting and metal parts and products for other manufacturers either on a bid or contract basis. Johnson also manufactured and sold metal products of his own. One

of the prime products manufactured and sold by Johnson was a single-stroke fruit juice extractor.

The manufacture of this juice extractor was based upon certain patents granted to Johnson. The description of the device to which the patent relates is as follows:

| Description | Application date | Date patented | Term in years | Patent No. |
|---|---|---|---|---|
| Juice extractor | June 5, 1936 | Aug. 25, 1936 | 14 | [1] 101,000 |
| Juice extracting device | June 8, 1936 | Aug. 24, 1937 | 17 | 2,090,913 |
| Juice extracting device | Mar. 31, 1937 | Sept. 27, 1938 | 17 | 2,131,440 |
| Juice extractor | Jan. 12, 1938 | Mar. 29, 1938 | 14 | [1] 109,062 |
| Juice extractor | Jan. 12, 1938 | Aug. 16, 1938 | 14 | [1] 110,897 |
| Juice extracting device | Jan. 17, 1938 | Oct. 31, 1939 | 17 | 2,177,939 |

[1] Design.

In addition to the above, Johnson received other letters patent, all granted prior to December 17, 1941, which patents concern not only juice extractors but heaters, mirrors, and other such devices.

With the outbreak of World War II, Johnson found it difficult to obtain essential metals required in his business. He concluded that in order to stay in business he would have to engage in war products production. Johnson approached his attorney who advised him to incorporate his business inasmuch as the Government contracts he secured involved new and different work. On December 17, 1941, Johnson caused to be formed the National Die Casting Company, Inc., an Illinois corporation, to which he transferred his manufacturing business previously operated as an individual.

At the time National Die Casting Company, Inc. (hereinafter called National), was incorporated, Johnson transferred all of his manufacturing assets to the corporation except the letters patent referred to above and certain real estate.

The reason that Johnson did not, at that time, transfer the patents and realty to the corporation was because he did not wish to subject these assets to the potential risk of National's obligations arising out of its activities in war work. Johnson wished to assure himself of the opportunity, if he so chose, to exploit the patents in his individual capacity at the termination of the war period.

After experiencing initial difficulty in retooling, National manufactured, under Government contracts, material for the war effort from the time of its incorporation until the latter part of 1945. The corporation was subject to renegotiation of its Government contracts. During this period National did manufacture and sell to the Navy fruit juice extractors covered by the above-listed patents. These sales, however, were small in quantity and their production was not continuous but was sporadic.

Johnson did not receive any royalties from the manufacture or sale of the fruit juice extractors to the Navy by National. He never asked

for any compensation nor did he enter into any oral or written agreement with respect to his right to compensation for the use of the letters patent by National.

The termination or cutoff date of National's war work came in the latter part of 1945. National was considering several products for civilian use at that time. It had developed an automatic record changer that could be applied to radio sets and would change intermixed 10- and 12-inch records. It planned to manufacture these record changers after the war but could not get parts. National decided to concentrate on the production of fruit juice extractors because of the few parts required, and the manufacturing know-how which it already possessed. This product permitted it to reconvert to civilian production quickly and to capitalize on existing civilian demand.

Johnson gratuitously permitted National to use his patents in the manufacture of these juice extractors. Such gratuitous permission was given by Johnson to National on a temporary basis.

Johnson temporarily permitted National to manufacture these fruit juice extractors under his six patents until National was through the period of contract renegotiation with the Government.

After the period of contract renegotiation, Johnson decided to continue to operate National as a corporation and not to go back into business as an individual. He consulted an attorney concerning the sale to National of the patents held in his name. He was advised that only those patents that he owned prior to the incorporation of National could be sold. The other patents which had been granted Johnson subsequent to National's incorporation could not be sold as National, in the opinion of Johnson's attorney, had "shop rights" in those patents.

On November 17, 1947, Johnson entered into a written agreement with National regarding the six aforementioned fruit juice extractor patents. The agreement is as follows:

### AGREEMENT

1. This agreement entered into November 17, 1947, as of the 1st day of October, 1947, by and between HERBERT C. JOHNSON, of Wilmette, Illinois (hereinafter called JOHNSON), and NATIONAL DIE CASTING COMPANY, a corporation of Illinois, having its principal place of business at Lincolnwood, Illinois (hereinafter called NATIONAL).

#### WITNESSETH:

2. WHEREAS, JOHSON [*sic*] is the owner of the entire right, title and interest in and to the following United States Letters Patent:

| Patentee | Patent No. | Date |
|---|---|---|
| Johnson | 2,090,913 | Aug. 24, 1937 |
| Johnson | 2,177,939 | Oct. 31, 1939 |
| Johnson | 2,131,440 | Sept. 27, 1938 |
| Johnson | Des. 101,000 | Aug. 25, 1936 |
| Johnson | Des. 109,062 | Mar. 29, 1938 |
| Johnson | Des. 110,897 | Aug. 16, 1938 |

3. WHEREAS, NATIONAL desires to purchase said patents and JOHNSON is willing to sell said patents to NATIONAL:

4. Now, THEREFORE, in consideration of these premises, and of the mutual convenants and agreements hereinafter set forth, it is hereby covenanted and agreed by and between parties hereto as follows:

5. Contemporaneously with the execution and delivery of this agreement, JOHNSON agrees to sell, assign, transfer and convey all his right, title and interest in and to said patents, and each of them, to NATIONAL together with all rights of action and recovery for past infringement thereof.

6. NATIONAL acknowledges receipt of said assignment and in consideration thereof and as the purchase price thereof agrees to pay to JOHNSON at the times, in the manner, and for the periods hereinafter set forth a sum equal to 6% of the selling price of all products sold by NATIONAL embodying any one or more of the inventions, devices or designs covered by any one or more of the above described unexpired patents, and 80% of all royalties or other compensation received by NATIONAL from the licensing or other disposition of any one or more of said patents to others, and 80% of all net recoveries of damages, profits or royalties on account of infringement of any of said patents by others.

7. NATIONAL further agrees that said payments shall be made by NATIONAL to JOHNSON for each successive three-month period after October 1, 1947 (commencing with the three-month period ending December 31, 1947) within thirty (30) days after the end of each such three-month period, during the entire remaining term of said patents and until the last of such patents shall have expired.

8. At the time such payments are due, NATIONAL shall, and hereby agrees to, furnish JOHNSON with a statement, which shall be sworn to by an officer of NATIONAL if requested by JOHNSON, setting forth in detail the quantity and selling price of each product sold by NATIONAL during the previous three-month period for which such payment is due embodying an invention, device or design covered by any one or more of said patents which has not expired prior to the commencement of such three-month period and separately showing the name of each licensee or other person from whom royalties or other compensation or damages has been received during such three-month period and the amount of royalties, other compensation or damage received from each.

9. For the purposes of this agreement products are deemed "sold" when invoiced by NATIONAL and the word "sold" includes the lease or other disposition of such products from which NATIONAL receives compensation, and the "selling price" is the net compensation to which NATIONAL is entitled for products sold after deducting trade discounts and freight or other allowances allowable to the purchaser but before deducting commissions or fees to brokers, agents or sales representatives.

10. This agreement shall be binding upon and inure to the benefit of JOHNSON, his heirs, executors, administrators and assigns, and NATIONAL, and its successors.

IN WITNESS WHEREOF, JOHNSON has hereunto set his hand and seal and NATIONAL has caused this agreement to be executed and its corporate seal to be hereto affixed by its duly authorized corporate officers.

/s/ Herbert C. Johnson  (SEAL)
HERBERT C. JOHNSON
NATIONAL DIE CASTING COMPANY
By /s/ G. W. Hanney
*Vice President*

ATTEST:
/s/ Edna A. Johnson
*Secretary*

Contemporaneously with the execution of the agreement set forth above, Johnson executed and delivered to National an assignment of the six fruit juice extracting patents. Said assignment is as follows:

### ASSIGNMENT

WHEREAS, HERBERT C. JOHNSON of the Village of Wilmette, County of Cook, State of Illinois is the owner of the entire right, title and interest in and to the following described United States Letters Patent:

| Patentee | Patent No. | Date |
|---|---|---|
| Johnson | 2,090,913 | Aug. 24, 1937 |
| Johnson | 2,177,939 | Oct. 31, 1939 |
| Johnson | 2,131,440 | Sept. 27, 1938 |
| Johnson | Des. 101,000 | Aug. 25, 1936 |
| Johnson | Des. 109,062 | Mar. 29, 1938 |
| Johnson | Des. 110,897 | Aug. 16, 1938 |

WHEREAS, said Herbert C. Johnson is desirous of conveying the entire right, title and interest in and to said patents to NATIONAL DIE CASTING COMPANY, an Illinois corporation, having its principal place of business in the County of Cook, State of Illinois, and said NATIONAL DIE CASTING COMPANY is desirous of acquiring said patents.

Now, THEREFORE, in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt whereof is hereby acknowledged, said HERBERT C. JOHNSON does hereby sell, assign, transfer and convey unto said NATIONAL DIE CASTING COMPANY, its successors and assigns, the entire right, title and interest in and to the aforesaid Letters Patent, including any divisions, continuations, reissues and extensions of said patents, or any of them, together with all rights of action and recovery for past infringement of said patents, or any of them; and the said HERBERT C. JOHNSON does hereby covenant and warrant that as of the date hereof he is the true and lawful owner of the entire right, title and interest in said Letters Patent, and each of them, and has full right and power to convey the same, and that the same are free and clear of all liens, charges and encumbrances whatsoever.

IN WITNESS WHEREOF, said HERBERT C. JOHNSON has hereunto set his hand and seal this 17th day of November, A. D. 1947 as of the 1st day of October, A. D. 1947.

/s/ Herbert C. Johnson    (SEAL)

STATE OF ILLINOIS &rbrace; SS
COUNTY OF COOK

I, Phyllis A. Yeager, a Notary Public in and for the County and State aforesaid, do hereby certify that HERBERT C. JOHNSON, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act for the uses and purposes therein set forth.

Given under my hand and notarial seal this 17th day of November, A. D. 1947.

/s/ Phyllis A. Yeager
*Notary Public.*

My commission expires: June 20, 1951

The assignment was recorded in the United States Patent Office on November 19, 1947.

Johnson received from National, under the agreement set forth above, the sums of $16,794.55 in the calendar year 1951; $10,238.20 in the calendar year 1952; and $11,853.35 in the calendar year 1953. Said sums are equal to 6 per cent of the selling price, as defined by the agreement, of all products sold by National, embodying any one or more of the inventions, devices, or designs covered by any one or more of the unexpired patents covered by the said agreement. The 6 per cent rate is not an unreasonable rate.

During the period of time in which Johnson gratuitously allowed National to use his patents for fruit juice extractors, National reopened its New York City sales office which had been closed for the duration of the war and had a sales representative in Los Angeles, California. National advertised fruit juice extractors in national magazines. National also purchased additional equipment which was applicable to the production and manufacture of juice extractors as well as other types of products which it made.

During the period January 1, 1947, to December 31, 1953, inclusive, Johnson owned the 2,000 authorized, issued, and outstanding shares of common stock of National, having a par value of $25 per share.

During the same period the 1,000 authorized, issued, and outstanding shares of preferred stock of National, having a par value of $100 per share, were owned as follows: 920 shares by Edna A. Johnson, wife of Herbert; 40 shares by Herbert C. Johnson, Jr., son of Herbert and Edna; and 40 shares by Richard E. Johnson, son of Herbert and Edna.

Herbert C. Johnson was president of National from 1941 until July 1952, when he became secretary and treasurer. He was also a director of National from the inception of the corporation. His wife was also a director, and there were other directors of which one was G. W. Hanney, who signed the agreement on behalf of National.

The agreement of sale and the assignment to National of the six fruit juice extractor patents by petitioner was fair and reasonable as judged by the standards of a transaction entered into by parties dealing at arm's length. The sale and assignment to National by petitioner served a valid business purpose, and conveyed the whole right, title, and interest of petitioner in the patents in question to National, which had theretofore operated, and continued to operate as a separate business entity.

The agreement of sale and assignment by Johnson to National of the six patents relating to the fruit juice extractors was a sale of assets held for more than 6 months, entitled to treatment as long-term capital gains.

OPINION.

The principal issue before us is whether certain payments received by petitioner Herbert C. Johnson pursuant to the agreement and the

assignment of November 17, 1947, are ordinary income or long-term capital gain.

It is respondent's general theory and first contention that the proceeds from any alleged sale of letters patent, which are payable periodically over a period coterminous with their use or are contingent on the production and sale of patented articles, are royalties and are to be taxed as ordinary income. Respondent further contends, in the alternative, that the alleged sale of the letters patent in the instant case is without substance and lacks a business purpose. Respondent concedes that the letters patent are capital assets in the hands of petitioner.

Neither party suggests that section 117 (q) of the Code of 1939 is applicable to the facts in the instant case, or that the provisions thereof are in any way determinative of the issues before us. See *Leonard Coplan*, 28 T. C. 1189, 1192 (1957).

Respondent has clung with tenacity to his first contention through nearly 12 years of extensive litigation during which time the courts have, however, consistently held against him.

We have recently had occasion to express our views in relation to this contention in *A. E. Hickman*, 29 T. C. 864 (1958), in which we said, in part:

It is clear that the transfer of a patent results in a capital gain or loss if the patent was a capital asset in the hands of the transferor and if the transaction amounted to a sale or assignment as distinguished from a license agreement. *Lynne Gregg*, 18 T. C. 291, 300 (1952), affirmed per curiam 203 F. 2d 954 (C. A. 3, 1953). It is not necessary that the payment from the transfer be a lump sum in order to constitute capital gain, but may be cast in the form of a percentage of sale or profits, or an amount per unit manufactured or sold, or any combination of the foregoing. *Carl G. Dreymann*, 11 T. C. 153, 163 (1948) ; *Edward C. Myers*, 6 T. C. 258 (1946). * * *

Respondent on brief notes that he is not unmindful of our consistent position but requests us to reexamine the whole area with a view toward upsetting our prior decisions. We have, of course, given full consideration to respondent's argument, but we are unconvinced, and see no occasion to change the approach which we have followed in earlier cases. As we said in *Leonard Coplan, supra*, at 1193:

Certainly, we are not disposed to reexamine the *Myers* case. It has been followed in too many cases, and has become too firmly imbedded in the law to justify reopening the issue at this time.

See also *Carroll Pressure Roller Corporation*, 28 T. C. 1288, 1291 (1957) ; *Robert L. Holcomb*, 30 T. C. 354 (1958).

Respondent's alternative contention that the transaction was a sham and served no business purpose is not supported by the facts. Respondent makes it clear that he does not seek to deny any taxpayer the right to deal with his controlled corporation, but alleges that

there must be a business purpose, without which, he reasons, the transaction must be treated as a sham.

Respondent contends that National was already the owner of a perpetual, unlimited license in the nature of a shop right, to make, use, and sell the patented articles as a result of the gratuitous use of the patents by National from 1945 to November 17, 1947. See *Neon Signal Devices* v. *Alpha-Claude Neon Corp.*, 54 F. 2d 793 (W. D. Pa., 1931); *Lukens Steel Co.* v. *American Locomotive Co.*, 197 F. 2d 939 (C. A. 2, 1952).

Assuming, *arguendo*, that National acquired such a license in the nature of a shop right, we have been cited no authority, and have found none, for the position that petitioner could not grant and convey to National greater rights than that of a licensee, i. e., the rights of an absolute owner of the patents. To the contrary, we have held that such a grant may be made even if shop rights existed, and that such a grant would not make the agreement a sham or fiction. *Roy J. Champayne*, 26 T. C. 634, 646 (1956). See also *Halsey W. Taylor*, 16 T. C. 376, 383, 384 (1951).

We think it is clear from the record that National operated as a separate business entity and that the sale and assignment by petitioner to National of all his right, title, and interest in the six juice extracting patents was not a sham, but was a bona fide transfer for a valid business purpose. Petitioner did not transfer his patents at the time National was originally organized because he did not wish them to become subject to the possible liabilities of National, which was embarking on the production of unfamiliar articles for the war effort. He did not transfer his patents immediately after the cessation of hostilities because National was still subject to Government contract renegotiation, with its possible business uncertainties. After the renegotiation period, he decided to and did transfer the patents to the corporation, and received a fair and reasonable rate of compensation. Under the circumstances, his acts were readily understandable, and there appears to be no reason why he should not have done so.

Viewing the record as a whole, there is no justification for disregarding the separate legal entity of the corporation as distinguished from its shareholders. "An agreement between a corporation and its sole stockholders is valid and enforcible, if the arrangement is fair and reasonable, judged by the standards of a transaction entered into by parties dealing at arm's length." *Stearns Magnetic Mfg. Co.* v. *Commissioner*, 208 F. 2d 849, 852 (C. A. 7, 1954). We have found that the agreement between National and petitioner was fair and reasonable under the above-quoted standard, and the stipulation of the parties lends support to this view.

We conclude, therefore, that the transaction was a sale of assets held for the requisite statutory period, and that long-term capital gains treatment is to be applied.

*Decision will be entered under Rule 50.*