OPINION. TuRnee, Judge: It is the position of the petitioner that he acquired an interest in the jet perforator patents from Sweetman on August 4, 1948; that he sold the interest so acquired to Tool Company on December 28, 1950; and that the payments received during the taxable years under the 1950 agreement constituted long-term capital gains from such sale. If, however, the license agreement of October 1, 1947, had effected a sale of the patents to Tool Company, as respondent contends, petitioner in 1948 acquired no ownership in the patents and could not and did not sell any interest therein to Tool Company under his modification agreement of December 28, 1950. Petitioner, on brief, admits that the Tax Court and other courts in a substantial number of cases have held that an exclusive license agreement, such as the October 1.1947, agreement herein, was “tantamount to a sale for tax purposes.” He contends, however, that notwithstanding the holdings in those cases, an exclusive license agreement does not constitute a sale “in the traditional sense,” and argues that a licensor still retains ownership of interests in the patents themselves. Based on that argument, he reasons that the licensors herein “retained certain of the interests which constitute a part of the bundle of rights normally referred to as complete ownership”; that, in the transaction of August 4,1948, he became the owner of the interests so retained by the licensors under the 1947 license agreement, which interests he sold to Tool Company on December 28, 1950. The contention, in our opinion, is without merit. The various provisions relied upon by petitioner as indicating retention of property rights by the licensors in the patents themselves are similar to those which have been considered in other cases, and it has been held that they did not represent reservations of interests so as to constitute the exclusive license agreement other than a sale. Kronner v. United States, 110 F. Supp. 730; Lamar v. Granger, 99 F. Supp. 17; Kimble Glass Co., 9 T.C. 183; Commissioner v. Celanese Corporation, 140 F. 2d 339. The first of the Tax Court cases referred to by petitioner as holding that exclusive license agreements, such as that herein, constituted sales of the patents, was Edward C. Myers, 6 T.C. 258, promulgated February 6, 1946. The Commissioner acquiesced in the Myers case on June 17, 1946. On March 20,1950, he abrogated his acquiescence, and ruled that royalties paid on a fixed percentage basis would thereafter be regarded as ordinary income. Mim. 6490, 1950-1 C.B. 9. It was this ruling that precipitated the execution of the December 28, 1950, modification agreements herein. The Tax Court and the other courts adhered to the view that the rule of the Myers case properly reflected the law. Not only did the rule in the Myers case continue to be settled law according to the decided cases, but in 1954 it became statute law with the enactment of section 1235 of the Internal Revenue Code of 1954. Under Public Law 629, enacted J une 29,1956, a similar section was added to the Internal Revenue Code of 1939, as subsection (q) of section 117.[4] The Commissioner, in the meantime, had recognized the 1954 enactment as applying to 1954 and subsequent jmars, but had adhered to his ruling in Mini. 6490 with respect to taxable years beginning after May 1, 1950, and before January 1,1954. After the enactment of section 117 (q) and the opinion in Leonard Coplan, 28 T.C. 1189, had been filed, the Commissioner reconsidered his position as stated in Mim. 6490, revoked the ruling, and again acquiesced in the Myers case, and likewise acquiesced in the Copian case and in Roy J. Champayne, 26 T.C. 634. Rev. Rul. 58-353,1958-2 C.B. 408. In the Coplan case, it had been held that a patent assignment by the owner in exchange for payments based on net sales was a sale or exchange, following the Myers case. In the Champayne case, it had been held that each of two agreements was an exclusive license agreement, under which the owner had transferred his “whole” right in each patent to a corporation; that the agreement amounted to a sale of the patent involved; that the payments by the corporation under the agreement were payments of purchase price, and that such payments constituted long-term capital gains to the licensor. Prior to August 4,1948, petitioner’s only interest in the patents, or relating to the patents in any respect, was as a stockholder of Tool Company, which owned the patents by reason of the exclusive license agreement of October 1, 1947. Sweetman, in the meantime, had acquired the rights of Robishaw, Dunnam, and Gratehouse in the October 1, 1947, agreement, whereby they had the right to collect and receive the payments by Tool Company for its exclusive license to the patents. Petitioner and his brother, by the agreements of August 4, 1948, acquired from Sweetman the rights in the 1947 license agreement which theretofore belonged to Robishaw, Dunnam, and Gratehouse to collect that portion of the selling price of the patents covering the interests which had been owned and sold by them. By the modification agreement of December 28, 1950, petitioner made no sale of any interest in the patents, because he owned no interest. The modification agreement, we think, was what the term implies, a modification or rearrangement, prospectively, of the payments thereafter to be received from Tool Company under the license agreement. Monthly payments in fixed amounts were substituted for payments based on the receipts by the Tool Company from the sale, lease, rental, or use of the devices covered by the patents. In the modification agreement, the petitioner, as did the other holders of interests in the October 1,1947, agreement, and as did the Tool Company, recited that the patents had been sold to the Tool Company under the license agreement dated October 1, 1947. It merely substituted fixed payments on a monthly basis for payments based on the receipts of Tool Company from the use of the patents. In substance, the situation here is the same as that dealt with in John W. Chamberlin, 32 T.C. 1098, affd. 286 F. 2d 850. In that case, Marian Chamberlin, as did the petitioner here, had, by assignment from the licensors, acquired an interest in the payments to be made by the licensee under the exclusive license. Thereafter the licensor and Marian gave notice to the licensee of an intention to cancel the license for default in payment of royalties and rendering certain statements called for by the license agreement. The dispute was settled, it being agreed that the license was in full force and effect and that notice of cancellation was premature and ineffective. Marian contended that the settlement under which payments under the license agreement were resumed constituted a sale or exchange. Overruling her contention, we said: It appears that both the licensor and licensee retained the same rights and obligations they had before the notice of cancellation and that payments thereafter made by Borg-Warner to Marian Chamberlin were based on the original agreement from Research to Borg-Warner and. the assignment of the right to receive the royalties by Research to Chamberlin and Bassett, which rights were purchased from them by Marian. Marian did not receive the payments as the result of a sale or exchange of a capital asset either by her or anyone else. Don O. Scott, * * * [26 T.C. 869]; Bratter v. United States, 161 F. Supp. 365. The payments were received as collection of a claim for royalties due and to the extent they exceed her basis, are taxable as ordinary income. Osenbach v. Commissioner, * * * [198 F. 2d 235, affirming 17 T.C. 797]. Similarly, in this instance, petitioner in the August 4, 1948, transaction acquired no interest in the patents and applications for patents. That had already been sold by Sweetman and his associates on October 1,1947. What petitioner acquired in 1948 was an interest in Sweetman’s right to collect payments under the 1947 agreement, and, as in the Chamberlm case, his receipts in excess of basis constituted ordinary income. Our decision in McCullough Tool Co., supra, does not require a holding to the contrary. In that case, the taxpayer was the Tool Company and the years involved were, as in this instance, 1951, 1952, and 1953, and the question was as to the proper depreciation allowance to the Tool Company to cover the exhaustion of the patents, it being the position of the respondent that the Tool Company had no fixed cost for the patents susceptible of depreciation. It was the contention of the Tool Company, on the other hand, that its cost had become fixed by the provisions of the December 28, 1950, agreement. In holding for the taxpayer, we pointed out that with the modification agreements the Tool Company’s cost for the patents had become definitely fixed and determined, and for the purposes of the decision there, it made no difference whether, under the views expressed in the Myers case, the licensor-vendors had effected a sale of the patents under the agreement of October 1,1947, or the sale had been effected by the modification agreement in 1950. What was material, was that the modification agreement had substituted a fixed cost to the Tool Company for a prior cost determinable only through gross receipts over the life of the patents. In that case, our findings of fact did contain what was in the nature of a statement of mixed law and fact that petitioner and his brother had each acquired in 1948 a 25 percent interest in the jet patents, but the decision there would have been the same even if there had been no sale at all of the patents by the li-censors to the Tool Company until the December 28, 1950, agreement. We conclude and hold that petitioner’s gains from the payments received during the taxable years from Tool Company pursuant to the agreement of December 28, 1950, were ordinary income. Decision will be entered under Rule 50. (q) Transfer of Patent Rights.— (1) General rule. — A transfer (other than by gift, Inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which Includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are— (A) payable periodically over a period generally coterminous with the transferee’s use of the patent, or (B) contingent on the productivity, use, or disposition of the property transferred. ****** ⅜ (4) Applicability. — This subsection shall apply with respect to any amount received, or payment made, pursuant to a transfer described in paragraph (1) in any taxable year beginning after May 31, 1950, regardless of the taxable year in which such transfer occurred.