Armais Arutunoff and Claudia Arutunoff v. Commissioner. Kyra Oil Co., Inc. v. Commissioner.
Arutunoff v. Commissioner
Docket Nos. 93815, 93816, 94621, 94622.
United States Tax Court
T.C. Memo 1963-192; 1963 Tax Ct. Memo LEXIS 152; 22 T.C.M. (CCH) 931; T.C.M. (RIA) 63192; July 19, 1963
Donald P. Moyers, 527 National Bank of Tulsa Bldg., Tulsa, Okla., and William A. Goffe, for the petitioners. J. C. Linge, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The respondent determined deficiencies in the petitioners' income taxes, as follows: Docket
Taxable Period
No.
Petitioner
Ended
Amount
93815
Armais Arutunoff and Claudia Arutunoff
12/31/57
$49,185.94
12/31/58
31,379.26
93816
Kyra Oil Co., Inc.
2/28/58
31,971.45
2/28/59
26,228.66
94621
Armais Arutunoff and Claudia Arutunoff
12/31/59
37,032.99 [1]
94622
Kyra Oil Co., Inc.
2/29/60
24,323.11 [2]
*153 The only issues for decision are: (1) Whether the transfer of certain Reda stock by petitioner Armais Arutunoff to Kyra Oil Co., Inc., is to be considered valid for tax purposes; and (2) whether Kyra Oil Co., Inc., should be denied the intercorporate dividend credit on its Reda dividends pursuant to section 269 of the Internal Revenue Code of 1954. Findings of Fact Some of the facts are stipulated and are found as stipulated. Petitioners Armais and Claudia Arutunoff are husband and wife residing in Bartlesville, Oklahoma. They filed their joint Federal income tax returns for the years in issue with the district director of internal revenue at Oklahoma City, Oklahoma, on the cash basis and for calendar years. Petitioner Kyra Oil Co., Inc., is incorporated under the laws of the State of Oklahoma and maintains its principal office at Bartlesville, Oklahoma. It filed its Federal income tax returns for the years in issue on the cash basis and on the basis of a fiscal year ended on the last day of February with the district director of internal revenue at Oklahoma City, Oklahoma. Armais Arutunoff was born in Russia in 1893. He attended the Petrograd Polytechnic *154 Institute [3] for five years, specializing in the field of electrical engineering. In 1915 and 1916 he developed a new type of electrical pump for raising liquids from oil wells. In 1917 he formed a corporation in Russia to produce this pump. However, the revolution in Russia in that year caused him to abandon the corporation and leave the country. After staying in Germany for a few years, he came to the United States in 1923. He manufactured his pumps through two corporations in the United States until the 1930's when he concentrated his business in the Reda Pump Company, a publiclyheld corporation of which he became the president in 1938. Armais and his family never held as much as a 50 percent interest in the Reda Pump Company, though they did hold a large block of stock in it. Phillips Petroleum Company held nearly as many shares in Reda as did Armais and his family and had representation on the board of directors of Reda. Reda had, on occasion, entered the oil production business chiefly to demonstrate the value of its pumps. Its pumps were useful primarily *155 in wells in which it was necessary, in order to make continued operation of the well economically feasible, to extract at reasonable cost large volumes of liquid. Armais, as president of Reda, had experience in identifying the type of oil property on which Reda pumps could be used to advantage, as well as experience in operating such properties with Reda equipment. Beginning in about 1953, Armais had discussions with an accounting firm concerning diversification of his assets. Most of these discussions were with G. A. Savage, a Tulsa representative of the firm of Arthur Young and Company, which did accounting work for both Reda and Armais personally. At that time Armais was 60 years of age and Reda stock constituted a disproportionately high percentage of his assets. Thus, Savage recommended that he diversify his investments. Armais considered selling or trading some of his Reda stock. However, he decided against this primarily because he had certain disputes with the representatives of Phillips Petroleum concerning the manner in which Reda should be operated and, therefore, did not wish to lessen his proportionate interest in the control of Reda. Armais, then, because of his desire *156 to diversify his investments and because of his experience in oil production, decided to go into the business of operating oil properties and, in particular, the type of properties that were best suited to the use of Reda's pumps. This decision did not conflict with his duties to Reda because Reda's entry into the oil production business was limited by customer resistance, by the opposition of Phillips Petroleum and by the provisions of a loan agreement under which Reda borrowed money from an insurance company. Armais, by utilizing his experience in oil production through a business of his own rather than through Reda, would be entitled to all of the income his ability produced and not limited to his share as a stockholder in Reda. Armais decided to organize his business as a corporation in order to limit his liability. As early as June 1956 Armais and others acting in his behalf began to look for oil properties that would be suitable for the type of operation that Armais wished to conduct. An offer was made at that time, in behalf of the corporation to be formed, to purchase the operating interest in a particular property. The purchase was not completed, however, because two of *157 the owners of the interest would not agree to the sale. In January 1957 another property was considered for purchase. No offer was made for this property because the cost of installing an adequate water disposal system was considered prohibitively high. As of February 20, 1957, the stock of Reda was held as follows: Phillips Petroleum Com-
pany
203,788 shares
32.96%
Armais Arutunoff
65,351 shares
10.48%
Claudia Arutunoff
57,758 shares
9.26%
Armais and Claudia Aru-
tunoff as Trustees or
Guardians
74,671 shares
11.98%
Children and Grandchil-
dren of Armais and
Claudia Arutunoff
14,994 shares
2.41%
Others
33.18%
Petitioner Kyra Oil Co., Inc., was incorporated on August 31, 1956, in order to hold oil properties and operate them for Armais. It was authorized to issue 1000 shares of common stock of a par value of $50 per share. Only 10 shares were purchased by the incorporators at that time and of these 10 shares all but 2 were later reacquired by Kyra and issued to Armais. On March 9, 1957, Armais agreed to transfer $15,000 in cash and assign his interest in 45,000 shares of Reda stock to Kyra in return for 498 shares of Kyra stock, which were *158 issued to him. The 45,000 shares of Reda stock that were assigned to Kyra on March 15, 1957, pursuant to the agreement, had a value of over $900,000 but were pledged to the Chase National Bank of the City of New York (hereinafter referred to as Chase) to secure a personal indebtedness of Armais which then had a balance of $295,00. Kyra did not assume this indebtedness. This transaction was reported to the Securities and Exchange Commission and Reda was instructed in writing to pay all dividends on this stock to Kyra. Thereafter and up to the time of the trial herein, all dividends on this stock were paid to Kyra. Also on March 9, 1957, Armais sold 14,000 shares of Reda stock to Kyra for a noninterest bearing unsecured promissory note in the amount of $300,000 payable in annual installments of $50,000 each. (The quotation of this stock on the American Stock Exchange at or about the time of the sale would indicate that the market value of 14,000 shares was approximately $300,000.) These 14,000 shares transferred to Kyra were registered in Kyra's name during March and the transfer was also reported to the Securities and Exchange Commission. The 45,000 shares were transferred to Kyra *159 in order to capitalize it sufficiently so that credit could be obtained from sellers in purchases of oil properties. The 14,000 unpledged shares were transferred to Kyra so that it would have assets to pledge for cash loans. This was done by sale rather than by contribution because, to the extent of the price of these shares, Armais wished to be in the position of a creditor with respect to his own corporation. Another reason for both transfers of stock was to provide Kyra with cash for its operations through the dividends on the Reda stock; Reda had not missed a dividend payment since 1936. During the years 1957 to 1960 Reda made the following dividend payments to Kyra: Total
Dividends
No. of
Amount
Year
per Share
Shares
Paid
1957
$1.30
59,000
$76,700
1958
1.05
59,000
61,950
1959
1.10
59,000
64,900
1960
1.05
59,000
61,950
Kyra made payments on its $300,000 note to Armais as follows: July 10, 1957
$15,000.00
August 8, 1957
5,000.00
September 12, 1957
6,500.00
October 5, 1957
4,000.00
October 15, 1957
10,000.00
November 5, 1957
5,000.00
January 3, 1958
10,000.00
January 6, 1958
3,000.00
January 10, 1958
8,000.00
April 14, 1958
10,000.00
June 10, 1958
9,000.00
July 1, 1958
3,000.00
July 30, 1958
3,000.00
September 12, 1958
7,000.00
September 29, 1958
3,000.00
December 12, 1958
5,000.00
February 9, 1959
12,000.00
March 30, 1959
7,500.00
April 21, 1959
10,000.00
June 18, 1959
2,000.00
June 19, 1959
2,000.00
July 13, 1959
7,500.00
July 28, 1959
534.50
August 7, 1959
8,000.00
September 28, 1959
5,000.00
October 14, 1959
10,000.00
October 26, 1959
5,000.00
February 1, 1960
12,000.00
April 14, 1960
10,000.00
May 17, 1960
67,000.00
June 28, 1960
1,500.00
July 12, 1960
8,500.00
October 12, 1960
10,000.00
February 9, 1961
14,965.50
*160 Armais made payments on his indebtedness to Chase as follows: March 25, 1957
$ 5,000.00
July 11, 1957
15,000.00
August 8, 1957
25,000.00
September 27, 1957
10,000.00
November 27, 1957
5,000.00
January 3, 1958
10,000.00
September 29, 1959
5,000.00
February 9, 1959
5,000.00
March 31, 1959
5,000.00
April 21, 1959
5,000.00
August 7, 1959
5,000.00
October 5, 1959
3,000.00
January 5, 1960
10,000.00
On October 28, 1958, Armais refinanced $100,000 of his Chase loan with the Irving Trust Company. On the same date Chase released 20,000 shares of Reda stock to the Irving Trust Company as security for this loan. The Irving Trust Company released 10,000 shares of this stock on January 25, 1960, and the remaining 10,000 shares on May 19, 1960. This stock was surrendered to Reda and new certificates were issued to Kyra. Chase released 10,000 shares of the Reda stock it held on January 26, 1960, and the remaining 15,000 shares on November 21, 1960. This stock was also surrendered to Reda and new certificates representing it were issued to Kyra. At or about the same time that Armais transferred the Reda stock to Kyra in March 1957 Kyra entered into an *161 agreement to purchase the operating interest in an oil property identified as the Sand Springs Lease. The purchase price was $15,000 in cash and a note for $185,000. The sellers retained an oil payment of $200,000. The sales agreement provided that the purchasers might at any time resell the property to the sellers in return for the cancellation of any balance due on the purchase price. Kyra began production on the property but a month or two after operations were begun a flood occurred in the area. After the surface water subsided, only water could be raised from the wells. Thus, after a reasonable waiting period the property was reconveyed to the sellers. Kyra incurred a net loss of approximately $11,000 on this transaction. In July 1957 Kyra made another purchase of oil properties which included several leases. Five of these leases were in Ohio and were designated as the C. Miller, Martin, Watson, W. Miller and Rumbaugh leases. The other lease was the Esso lease, which was located in New Jersey. These leases were purchased for $5,000 in cash, a note of $145,000 and an oil payment of $450,000 was retained. Some of the Ohio leases were operated by Kyra and produced oil from which *162 substantial sales were realized from the time of acquisition. However, the Esso lease, which was considered to have considerable promise, could not be developed for maximum production until Esso, which had a refinery adjoining the well area, had completed certain improvements on the refinery. In December 1957 and January 1958 two other oil properties were investigated by Kyra. However, neither of them was acquired. In August 1958 the Wineinger lease was acquired for testing purposes and approximately $3,000 was spent in testing it. This lease was ultimately reassigned to the prior owners because no commitment could be obtained for the sale of the gas it produced. In June 1959 the sum of $16,447 was invested in the development of the Rumbaugh lease and the W. Miller lease. These leases, previously acquired by Kyra in July 1957, were not developed prior to 1959 because no commitment for the purchase of their oil could be obtained until that time. During 1960 eight other properties were considered by Kyra for purchase. Some interest was acquired by Kyra in five of these properties. Kyra had income from oil production as follows: Year Ended
Amount
2/28/58
$ 30,054.95
2/28/59
32,589.96
2/29/60
58,956.98
2/28/61
137,112.46
*163 The respondent, in his statutory notice and/or in his pleadings, has determined that the dividends paid on the 59,000 shares of Reda stock during the years at issue were taxable to Armais, or in the alternative, that Kyra is not entitled to the dividends received credit with respect to those dividends. The assignment by Armais of 45,000 shares of Reda stock to Kyra and the sale of 14,000 shares, both of which occurred in March 1957, were made for business purposes and were valid, legal and regular. The principal purpose for which Armais acquired Kyra was to engage in the oil production business and was not the evasion or avoidance of income taxes. Opinion The respondent makes only two contentions in regard to the transactions in which Reda stock was transferred to Kyra. His first contention is that the transfers of Reda stock were shams and without business purposes and that the dividends paid on them are taxable to Armais. Whether Armais' transfer of his Reda stock to Kyra was done for a valid business purpose or was a mere sham is a question of fact. John Junker Spencer, 19 T.C. 727 (1953). The petitioners have offered a great deal of credible evidence *164 that the Reda stock was transferred to Kyra for business reasons. The respondent, on the other hand, has pointed only to the fact that Kyra would be entitled to the dividends received credit with respect to the dividends on the Reda stock to show that tax motives controlled the transaction. Therefore, we have concluded that the transfer of the Reda stock to Kyra was not a sham but was made for valid business reasons. See John Junker Spencer, supra; Herbert C. Johnson, 30 T.C. 675 (1958). The second contention of the respondent is that Armais acquired Kyra for the principal purpose of avoiding income taxes by use of the intercorporate dividends received credit with respect to the dividends received on the Reda stock and that, therefore, this credit should be disallowed to Kyra pursuant to the provisions of section 269(a) of the Internal Revenue Code of 1954. [4]
*165 Section 269(a) is applicable to the acquisition of a corporation only when the tax avoidance purpose exceeds in importance any other purpose for the acquisition. Section 1.269-3, Income Tax Regs.; Commodores Point Terminal Corporation, 11 T.C. 411 (1948). In view of the substantial efforts of Kyra in acquiring operating interests in oil leases and in producing oil, we find that Armais' principal purpose in acquiring Kyra was to enter the oil production business and not to avoid income taxes. Decisions will be entered for the petitioners in Docket Nos. 93815 and 94621. Decisions will be entered under Rule 50 in Docket Nos. 93816 and 94622. Footnotes
1. By amended answer filed June 28, 1962, respondent redetermined this deficiency to be $32,842.03. ↩
2. By amended answer filed June 28, 1962, respondent redetermined this deficiency to be $31,129.91.↩
3. The record indicates Armais attended the Belgrade Technical Institute, but this appears to be a typographical error.↩
4. SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General. - If - (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controtted, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.↩